THE MAYOR AND CITY COUNCIL OF BALTI-
MORE, JAMES H. SMITH, BUSHROD M. WATTS
AND HENRY F. NEW, COMMISSIONERS FOR OPENING
STREETS OF BALTIMORE CITY, AS SUCH, AND AS THE
ANNEX COMMISSION, *vs.* BETTIE M. BRENGLE AND
AUGUSTA SCHETLICH.

*Closing of streets in Baltimore City: power of Commissioners
for Opening Streets. Public and private benefits.*

By Chapter 274 of the Acts of 1904, the Commissioners for
Opening Streets in Baltimore City have the power to close
streets as well as to lay them out or to widen, straighten,
grade and pave them.                              pp. 344, 346

And *semble,* payment for the closing of streets, which are to
be closed in connection with the opening and grading, etc.,
of other streets, may be made by the commissioners out of
the issue of city stock which is authorized by the act.   p. 344

To the commissioners, and to the commissioners alone, is sub-
mitted the authority and discretion to select what streets
shall be opened or closed.                              p. 348

Merely because some parties may receive from the closing of a
street more direct benefit than the public at large, it does not
follow that the closing of the street is private and not for a
public benefit.                              .           p. 348

A street can not be closed even for a public purpose without
just compensation to those entitled to it.     ·        p. 351

*Decided June 24th, 1911.*

Appeal from the Baltimore City Court (DOBLER, J.).

The cause was argued before BOYD, C. J., BRISCOE, PATTISON, URNER and STOCKBRIDGE, JJ.

*German H. H. Emory* and *Joseph Goldsmith,* for the appellants.

*David B. Chambers* and *William Edgar Byrd,* for the appellees.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from an order of the Baltimore City Court quashing the proceedings of the Commissioners of Opening Streets, acting as the Annex Commission of the City of Baltimore, instituted for the closing of Morris Avenue between Westwood Avenue and Eleventh Street. Three main questions seem to have been raised in the lower Court They were: 1st. Is Morris Avenue a public highway subject to the laws which regulate the opening and closing of streets? 2nd. Has the Annex Commission power to close that avenue? and 3rd. Is the proposed closing of the avenue for a public use? The lower Court decided the first two questions in favor of the city but quashed the proceedings on the ground that the closing of the avenue was not for a public purpose. From the order thus quashing those proceedings, this appeal was taken.

1. We do not understand it to be contended in this Court by the appellees that Morris Avenue is not a public highway, and as the testimony seems to be conclusive on that question we will not discuss it but treat it as so established.

2. By the Act of 1904, Chapter 274, the Mayor and City Council of Baltimore were authorized to issue stock to the amount of two million dollars, from time to time and payable at such times and bearing such rate of interest as they should by ordinance prescribe; provided, however, that not more than five hundred thousand dollars of stock shall be issued in any one year. It was then provided that "The pro-

ceeds of the sale of said stock shall be used only for the pur-
pose of providing the costs and expenses of condemning,
opening, grading, paving and curbing the streets, avenues,
lanes and alleys of the Annex portion of Baltimore City."
By section 2 provision is made for a special commission to
be known as the "Annex Improvement Commission," which
was to continue in office until the work of the commission
was completed—provision being made for filling vacancies.
Section 10 enacted that in lieu of the commission provided
for by Section 2, the Mayor and City Council could by ordi-
nance authorize and empower the Commissioners for Open-
ing Streets of Baltimore City to perform the duties and
functions prescribed for the said commission, and that was
done.

It will be observed that in the above quotation, providing
for the use of the proceeds of the sale of the stock, the
word "closing" is not included, but by section 3 it is enacted
"That said commission shall have the right and power to
condemn, lay out, open, extend, widen, straighten, *close,*
grade and pave any street, avenue, lane or alley or any part
thereof, from curb to curb," and it is expressly stated "That
said commission shall have all powers necessary and proper
in the exercise of said powers." The definite power to *close*
any street, avenue, etc., was thus vested in the commission,
and although that word is not used in the section providing
for the use of the proceeds of the sale of the stock, if
the commission has the power to close this avenue, we are
not specially concerned as to the use of the money, as in
this instance no money is required. These appellees were
allowed ten dollars damages and were assessed ten dollars
for benefits, and the total damages allowed and costs of the
proceedings were $705.89, which amount is balanced by the
benefits charged. In addition to that the Hilton Land Cor-
poration, Max Brafman and Oregon Milton Dennis executed
a bond to the city indemnifying it against all costs, expenses,
etc., connected with the closing of this avenue. Whether or

not the commission could use part of the money realized from the stock for closing a street, which is to be closed in connection with the opening, grading, etc., of other streets, is therefore not a practical question in this case .

In *Baltimore City* v. *Flack,* 104 Md. 107, this act was held to be valid, and was considered at length in reference to the question then before the Court. CHIEF JUDGE McSHERRY, in speaking for the Court, quoted from section 3 so much of the language as was applicable to that case—the power to grade and pave—and said: "The powers thus given are broad and unqualified." The power to *close* any street, avenue, etc., is just as broad and unqualified as that to grade and pave, as they are all in one sentence. Indeed in some cases the power to close would be essential to an intelligent exercise of the power to open, grade, pave, etc., and hence it may be that in speaking of how the proceeds of the two million loan were to be applied, the word "closing" on page 123 of 104 Md. was purposely used, but, even if it was inadvertently inserted in the connection in which it was used, there can be no doubt of the power of the commission to close any street, avenue, etc., which must properly be closed in carrying out a plan adopted by the commission for opening, straightening, etc., streets. A street which runs diagonally across a block, as Morris avenue does, would not only be unnecessary, but would be a serious injury to most of the lots in that square, and would result in the erection of an undesirable class of houses, as the lots would not be large enough for better buildings, and would be a useless burden upon the city in keeping it in order.

It must be remembered that these two million dollars were to be expended in the Annex part of the city, which was prior to 1888 in Baltimore county, and the Legislature must have known that there would be streets, avenues, lanes and alleys, which were originally roads of the county, and which were so laid out that some of them must either be closed, or the neighborhood injured rather than benefitted by opening

new streets, laid out in the way city streets usually are. So without dwelling longer on that branch of the case, we have no doubt about the power of the commission to close a street situated as this is, with reference to the other streets which are to be opened.

3. We are of the opinion, however, that the learned Judge who decided this case was in error in quashing these proceedings for the reason given by him. The commission was required by the act, immediately after its appointment and organization, to cause to be prepared for its guidance and use a map or maps of the entire Annex, or any part or parts thereof "showing the streets, avenues, lanes and alleys and the number of houses situated in and the area of each block of ground in said Annex, and such other information as may be desired.'

By the Act of 1892, Chapter 138, a part of the loan therein provided for was authorized to be used for the preparation of topographical maps. Then Chapter 576 of the Acts of 1894 prohibited avenues, streets and alleys in the Annex from being opened, established, or condemned, and the dedication of such from being accepted, unless they conformed to the plans, plats and surveys, defined by the topographical survey, then being prepared, unless otherwise provided by an Act of Assembly. By ordinance No. 129, approved December 3rd, 1898, the city adopted the completed plans of streets, etc., for the Annex territory. The street plans have been further regulated by Acts of 1902, Ch. 453, 1904, Ch. 433, and 1906, Ch. 158. A copy of the part of the topographical map which includes the section of the Annex with which we are now concerned is in evidence, and shows that the streets are laid out thereon at right-angles, but Morris avenue (which is not adopted as one of the streets) runs diagonally across the square formed by Westwood avenue on the north, Presbury avenue on the south, Ellamont (formerly Tenth) street on the east, and Hilton (formerly Eleventh) street on the west. It then runs across Ellamont street and cuts off a strip of ground at the corner of Westwood avenue

and Ellamont street. That takes off a small strip of the appellees' lot, which is supposed to front on Morris avenue but in point of fact they have planted a hedge and inclosed the part of that avenue between their lot and Westwood avenue.

It will thus be seen that according to the plan proposed by the topographical survey and map, this territory was intended to be laid out in squares, and Morris avenue was not expected to be kept open, as the map very clearly indicates. In laying out the property in this way, it would be wholly unreasonable to require the city to leave Morris avenue open, for it would depreciate the value of the property, destroy all prospect of beautifying that locality, as it might be with streets and alleys properly laid out, and would impose the useless burden on the city of keeping that avenue in proper condition, lighting it, etc. The legislature and the Mayor and City Council, by virtue of the authority vested in them by the legislature, have thus in plain terms expressed their determination to have the streets in the Annex territory laid out in a systematic way, such as is becoming a city of the size of Baltimore.

Section 5 of Chapter 274 of the Acts of 1904, provided that the commission should be the agent of the Mayor and City Council to acquire by gift, purchase, lease or other methods of acquisition, or by condemnation, any private property whatsoever, including streets, avenues, lanes and alleys, rights or interests, franchises or easements that may be required to open, widen, extend, straighten, *close,* grade or pave any street, avenue, lane, etc. It further provides that as soon as the title to the property so acquired has been certified by the City Solicitor the commission should have the same conveyed to the Mayor and City Council. As a part of the plan, and before they would close Morris avenue, the commissioners required the Hilton Land Corporation to convey in fee to the city, as and for a public street and highway, all that part of the bed of Eleventh street, from the south side of North avenue to the north side of Morris avenue, except-

ing the part of the east half thereof extending southerly from
North avenue 68 feet. North avenue runs parallel with and
is a square beyond Westwood avenue. They also required
that company before conveying it to grade and macadamize
Eleventh street, and, particularly as it is a wider street than
Morris avenue, it would seem to be established that it is a
much better one than that avenue, which is not graded or
improved.

We think the record shows that the closing of Morris ave-
nue can fairly be said to be a part of the plan adopted for
the annexed territory under legislative sanction. The com-
mission can not execute any plan it may have at one time,
and although Mr. New, one of the commissioners, said that
but for this application the avenue would probably not have
been closed at that time, he said, "it would have been closed
eventually, because the Topographical Commission has pro-
vided for it; the Board of Public Improvements has given its
approval and the City Engineer has requested that Morris
avenue be closed." It was said of the question of paving in
the case of *Baltimore City* v. *Flack,* 104 Md. on page 123,
"it is apparent that the legislature contemplated that the
commission should do only *part* of the work of paving each
year; and inasmuch as to no other department or agency of
the city government was there delegated any authority to
determine *what* part should be paved in any of the four years
over which the work was required to extend, it must inevita-
bly follow that to the commission, and to it alone, was com-
mitted the authority and the discretion to select, in the exer-
cise of the broad powers entrusted to it, the streets to be
paved each year." That language might well be applied to
opening and closing streeets, as well as to paving them.

It can not be said that, because some parties may receive
more direct benefits than the public at large by closing this
avenue, it is therefore for a private and not a public use. A
street opened, graded and paved through a piece of land may
enable the owner to sell lots for many times their former
value, and it sometimes results in making a few persons

M. & C. C. OF BALTO. vs. BRENGLE.          349

Md.]                     Opinion of the Court.

wealthy; but it can not be said that because the opening of
the street may have such an effect it is for a private and not a
public use.   It is perhaps rare for an application to be made
to the county commissioners of a county to open, alter or
close a road, excepting when one or more persons are spe-
cially interested in having it done.   The cases of *Jenkins* v.
*Riggs,* 100 Md. 427, and *Riggs* v. *Winterode, ibid.* 439, are
striking instances of special benefits derived by an individual
by the closing of an old road and the opening of new ones.
The old road had not only reverted to Mr. Riggs, but was
actually conveyed to him; but in the judgment of the county
commissioners the public was benefited by the changes and
Mr. Riggs was sustained by this Court in what was done.

Nor does the case of *Van Wilsen* v. *Gutman,* 79 Md. 405,
by any means conclude this.   Jew alley ran from Marion
street on the south to Lexington street on the north, and was
eighteen feet wide at the southern and twelve feet at the
northern end.   Mrs. Gutman ownd lots at the southern end
fronting 73 ft. 5 inches on each side of the alley.   An ordi-
nance authorized the closing of that portion of the alley on
which her lots bounded.   All of the other owners would have
been debarred from access to their properties from Marion
street, and there was no substitute for it.   This Court said:
"This is palpably and plainly taking their private property
for her private use.   In other words, it is a forced sale to
her of their property.   The extinguishment of their interests
does not appear to enure in any way to the public service; nor
to tend to the relief of any public necessity, nor to promote
any public interest, nor to subserve any public purpose, nor
to be connected with anything used by the public, nor, in
short, to have any relation to the public convenience or pub-
lic welfare."   That was manifestly correct, as no one but
Mrs. Gutman, who could build on the part of the alley thus
closed, would be benefited by closing it, and the public
could have been in no way helped, and there was no occa-
sion, so far as the public was concerned, for closing the part
of the alley.

350     M. & C. C. OF BALTO. vs. BRENGLE.

Opinion of the Court.                    [116

But that is a wholly different case from this, as we have already pointed out. If that portion of Baltimore is thickly built up, as of course it is expected to be, it can not be denied that the public at large will be benefited by having the property regularly laid out in squares, with streets such as the plans call for, rather than have a street—the successor of an old county road—running diagonally across the territory included. If a street can not be closed under such circumstances as we have in this case, such public improvements as are contemplated by the acts referred to would be effectually obstructed, and as the commission is authorized to close streets, and it is not contended that it did not comply with the provisions required to accomplish that end, in our opinion it is abundantly shown that it is for a public use which is not affected by the fact that a few owners will be specially benefited, because they may have the exclusive use of the roadbed after it is closed. That is generally the result when any road, street or alley is closed.

The case of *Matter of the Mayor,* 157 N. Y. 409, is very analogous, although not precisely like this. It was there held that the closing of a street in furtherance of a general street improvement plan constitutes the closing of a street for a public purpose, and in the opinion of the Appellate Division, reported in 28 *App. Div.* 143, which was approved by the Court of Appeals, it was said: "The fact that as a consequence of closing of the street, private ownership in its bed results, and that provisions are made by the law by which the land can be utilized and rendered valuable, does not convert the main purpose of the legislature from a public to a private one." See also *Henderson v. Lexington,* 22 L. R. A. (N. S.) 20; *Grafton v. St. Paul M. & M. Ry. Co.,* 20 L. R. A. (N. S.) 1; *Lewis on Eminent Domain,* sec. 209.

The condemnation map filed shows that in addition to the streets adopted by the plan, there are also alleys—one ten feet wide, from Westwood Avenue to Presbury Street, and one seventeen feet wide from Eleventh Street to the other alley. The record is not altogether satisfactory as to the con-

dition of Presbury Street, but we assume that the Commissioners will see that the interests of the public are properly protected with reference to it, and that is not a question now before us. With the use of that and Eleventh Street, together with the others in that neighborhood, it is difficult to see how any one can be materially injured by closing Morris Avenue between the points named, but, of course, a street cannot be closed even for a public purpose without just compensation to those entitled to it. No question about the regularity of these proceedings was raised before us, but it is stated in the bill of exceptions in effect that the proceedings of the Commissioners were regular and in proper form, although, of course, the appellees did not admit the power and authority of the appellants to close Morris Avenue, and extinguish the easement thereover.

For reasons given we will reverse the order of the lower Court.

*Order reversed, and cause remanded, the appellees to pay the costs.*