CLARENCE G. BOUIS

*vs.*

THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*Baltimore City—Opening of Street—Injunction—Preliminary Advertisement—Parkway as Street—Tender of Compensation.*

If Baltimore City undertakes to condemn land for a street under an ordinance which is void, that a property owner fails to appeal from the decision of the Commissioners for Opening Streets does not prevent him from asking the aid of equity.

p. 288

The title of the Baltimore City ordinance of April 25, 1911, providing for the opening of Gwynn's Falls Parkway, *held* correctly and sufficiently to describe the subject-matter.     p. 288

In the absence of any showing to the contrary, a notice preliminary to the passage of an ordinance for the opening of a street, published in accordance with the requirements of the Baltimore City Charter, sec. 828, may be presumed to have been published by an "official, officer, employee, agent or agency" of the city, within the meaning of Act 1908, ch. 142, authorizing a notice to be published by such person or agency, under certain circumstances, in a German newspaper.     p. 289

Though Baltimore City Charter, sec. 828, requires a preliminary notice of a street opening ordinance to be given by advertisements published as therein directed, and "also" by filing a map on or before the first day of publication, the map may be referred to in the advertisement, and made a part thereof, in order to make the description more easily understood.     p. 291

A "parkway" or "boulevard" is a street for the purpose of condemnation proceedings under the Baltimore City Charter, and the city is not prevented, by subsection 4 of section six, in reference to the purchase or condemnation of land for parks, squares, boulevards and parkways, from proceeding, under sec-

tion 825, to condemn a parkway or boulevard, which is a street and a highway. p. 292

That a proceeding to condemn land for a long street and parkway, under a city ordinance passed for the purpose, is still pending, and the street and parkway is not yet actually opened, does not preclude the passage of another ordinance closing and relocating parts of the proposed street and parkway as described in the prior ordinance. pp. 293-296

In affirming a decree sustaining a demurrer to a bill filed by property owners to restrain proceedings to condemn land for a street on the ground that the ordinances under which such proceedings were instituted were invalid, *held* that the affirmation should be without prejudice to the plaintiff filing a bill for an injunction, if necessary to prevent the city authorities from taking possession of the property before they were entitled to do so. p. 297

The provision in section 827 of the Baltimore City Charter, authorizing the city to pay into court the money awarded in condemnation proceedings, in case, by reason of conflicting claims, refusal to accept, or any other cause, such money cannot be safely and reasonably paid to any person or persons, does not require the money so paid into court to be legal tender, even though it may be a better practice to make a legal tender when that can conveniently be done. pp. 297, 298

A refusal by the property owner to accept such money on the ground that it was not legal tender was utterly inconsistent with allegations by him that the ordinances under which the condemnation proceedings were instituted were void. p. 298

*Decided April 6th, 1921.*

Appeal from the Circuit Court of Baltimore City (STANTON, J.).

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, URNER, ADKINS, and OFFUTT, JJ.

*Arthur W. Machen, Jr.,* with whom were *Hershey, Machen, Donaldson & Williams* on the brief, for the appellant.

*Frank Driscoll, Assistant City Solicitor,* with whom was *Roland R. Marchant, City Solicitor,* on the brief, for the appellee.

BOYD, C. J., delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of Baltimore City, sustaining a demurrer to a bill of complaint filed on the 6th day of January, 1920, by the appellant against the appellee and dismissing said bill of complaint. Amongst other relief asked for in the bill was an injunction, which was directed to be issued the same day the bill was filed. Inasmuch as there were a number of exhibits which were not filed before the injunction was issued, there was error in directing it to be issued, and as no other relief could have been granted under the bill in the absence of some of the exhibits, the demurrer would necessarily have been sustained. But on the 15th of November, 1920, a petition was filed asking leave to file copies of certain proceedings of the Commissioners for Opening Streets, plats and ordinances, which were involved in the case, and the same day an order was passed granting leave to file the exhibits referred to as part of the bill of complaint, without dissolving the injunction theretofore issued, and providing that when filed they might stand and be treated as part of the bill. They were filed the same day and, without meaning to hold that filing them at that time was sufficient to avoid the effect of the demurrer previously filed, or that the Court could continue the injunction, which was issued before they were filed, we will pass upon the main questions which we understand were intended to be raised by the demurrer.

Three ordinances were passed by the appellee in reference to what is called Gwynn's Falls Parkway, which is intended to connect Gwynn's Falls Park with Druid Hill Park. Those ordinances are No. 678, approved April 25, 1911, and No.

169 and No. 170, approved July 14, 1916. The titles of them are as follows:

"No. 678.

"An ordinance to condemn and open Gwynn's Falls Parkway, a boulevard one hundred and twenty feet wide, from the intersection formed by the southwesternmost side of Liberty Heights Avenue (formerly Old Liberty Road) and the southwesternmost side of Reisterstown Turnpike Road to the outline of the parcel of land conveyed to the Mayor and City Council of Baltimore by John B. Roberts, etc., by deed dated October 21st, 1907, and recorded among the Land Records of Baltimore City in Liber R. O. No. 2378, folio 354, etc., in accordance with a plat thereof filed in the Office of the Commissioners for Opening Streets on the 17th day of March, 1910, and now on file in said office."

"No. 169.

"An ordinance to condemn and close several portions of Gwynn's Falls Parkway, as now in process of opening, between the Western Maryland Railroad and Liberty Heights Avenue, and between Allendale Street and Clifton Avenue, in accordance with plats thereof filed in the Office of the Commissioners for Opening Streets on the 12th day of February, 1916, and now on file in said office."

"No. 170.

"An ordinance to condemn, open and relocate Gwynn's Falls Parkway, between the Western Maryland Railroad and Liberty Heights Avenue, and between Allendale Street and Clifton Avenue, in accordance with plats thereof filed in the Office of the Commissioners for Opening Streets on the 12th day of February, 1916, and now on file in said office."

The plaintiff owned the leasehold interest in a rectangular lot of ground, at the northwest corner of Chelsea Street and

Beech Avenue, fronting sixty feet on Chelsea Street, with a depth of about a hundred and twenty-five feet on Beech Avenue, subject to a ground rent of $150 per annum, and also a lot immediately adjoining it on the north, of the same frontage and depth. The former is improved by a frame dwelling, and the other lot is vacant. The theory of the plaintiff is that the ordinances in question are void, and therefore the fact that he did not take an appeal from the decision of the Commissioners for Opening Streets does not prevent him from asking the aid of a court of equity. If it be true that the defects relied on were not mere irregularities, but made the ordinances void, there can be no question about his right to go into equity. *Ritchie on Mun. Condem.,* Sec. 194 and cases cited. We will, therefore, determine whether they were void.

1. It is contended that ordinance No. 678 is void because the title does not correctly describe the subject-matter, and that the other two ordinances, being dependent upon it, fall with it. Section 221 of Article 4, Pub. Local Laws, entitled "City of Baltimore," provides that: "Every ordinance enacted by the city shall embrace but one subject, which shall be described in its title." We have seen above what the title is, and have no doubt as to its sufficiency under the many decisions of this Court in reference to a similar provision in the Constitution of the State concerning titles of statutes. See also *Baltimore* v. *Wollman,* 123 Md. 310.

2. It is contended that Nos. 169 and 170 are void for the further reason that one of the preliminary notices required was published in German, in a German newspaper, instead of in two papers published in English. We held in *Bennett* v. *Baltimore,* 106 Md. 484, that: "It is well settled as a general proposition in this country that in the absence of a direction to the contrary the publication of a notice required by law to be made must be in the English language and in a newspaper published in that language." At its next session the Legislature passed the Act of 1908, Chapter 142, which is now Section 222-A of the Charter of Baltimore of 1915.

It provides: "That whenever the Mayor and City Council of Baltimore, or any official, officer, employee, agent or agency thereof, shall be required or authorized under the provisions of any general or local law, or ordinance, now in force or hereafter to be enacted or adopted, to publish a notice of any description whatsoever in more than one newspaper, one of such newspapers, in the discretion of the said municipal corporation or of the said official, officer, employee, agent or agency thereof, may be a newspaper published in the German language," etc. The bill does not show who caused the notices to be given by the advertisements—it is only said that it was done by "some person or persons to your orator unknown." We cannot agree with the appellant that under Section 828 some "official, officer, employee, agent or agency" of the city could not have caused the advertisements to be published, or, if so, that they would not be within the provisions of the Act. Section 828 of the Charter not only provides that "notice shall be given by advertisement published twice a week for two consecutive weeks, in two of the daily newspapers in the said city," but that "notice shall also be given by filing, in the office of the Commissioners for Opening Streets, on or before the first day of such publication, a map," etc. It is possible, if not probable, that some one connected with the office of the Commissioners for Opening Streets, or other agency of the city, may have had them published. It is said in Section 32 of *Ritchie on Mun. Condem.*, that "application for an ordinance to authorize the opening, widening or closing of streets may be made at the instance of the city itself, or at the instance of the property holders," and we can have no doubt about that. It may well happen that the city authorities may desire to have a street opened, widened or closed. So without deeming it necessary to determine in this case whether the language of the Act of 1908, Chapter 142 (Section 222-a of Charter) is not sufficiently broad to include such applications as these, even if shown to be made by property holders, as there is nothing in this case which requires us to do so, we are

of the opinion that the objections to ordinances No. 169 and No. 170 on the ground that one of the advertisements was published in a German newspaper cannot be sustained.

3. It is also contended that the proceedings are void because the preliminary advertisements on which the several ordinances are based did not comply with Section 828 of the City Charter, in that they did not give the length and width and the present and intended width of the Parkway at Beech Avenue. No errors in the descriptions are referred to, and unless there were some substantial errors which were misleading and material, we cannot understand why any competent surveyor or engineer could not determine the length of the Parkway and the present and intended width of Beech Avenue. It may be true that a property holder who is not a surveyor or engineer could not readily tell from that long advertisement just what the width of Beech Avenue was, and was to be, without a plat or map of some kind to guide him, but the same might be said of many advertisements of mortgagees' or trustees' sales or other advertisements in use. A casual reading of the description in No. 678, for example, would inform a man of ordinary intelligence that the proposed Parkway was to pass the corner of Chelsea Street and Beech Avenue and that the general width of the Parkway was to be 120 feet, varying from that at certain points. In *Riggs* v. *Winterode,* 100 Md. 439, 447, we quoted from *Baltimore* v. *Bouldin,* 23 Md. 370, where it was said: "It would be fatal to the objects for which these powers are delegated by the General Assembly of the State, to require all the notices of the application for ordinances to carry into effect these powers to specify with technical precision the objects for which the application will be made." That is still true, notwithstanding the changes made in the Charter, and now in Section 828.

But if there be any question about the property owners being able to understand from the advertisements where the proposed Parkway was to be, the map filed was certainly sufficient. The plaintiff only filed, under the leave of the Court

of November 15, 1920, such parts of the map as showed the property of the plaintiff and that near it, but the width of Beech Avenue, as it was originally, and of the Parkway as proposed, as well as the length, etc., could easily be ascertained from the maps in connection with the advertisements. It is true that the statute provides that notice shall be given by advertisements to be published as therein directed, and *also* by filing a map, but the statute did not mean, and we did not intimate in *Whitely* v. *Baltimore,* 113 Md. 541, or elsewhere, that the advertisement could not refer to the map and make it a part of it. In *Burk* v. *Baltimore,* 77 Md. 471, this Court held that the notice and ordinance passed in pursuance thereof must conform in substance, and that "it was entirely proper, instead of trying to give a minute and accurate description, to provide in the ordinance that Whitelock Street (the one then in question) should be condemned and opened 'as located on said plat.' " Again it was said: "The ordinance does not undertake to define with accuracy the lines of the proposed street, the plat being referred to for that purpose, and if there should be any variance between the courses and distances and measurements contained in the ordinance and those set forth in the plat, the latter will govern. This is the rule where a plat or map is referred to in a deed, and we can see no good reason why the same rule should not apply here." In each of the notices in this case, the plat was referred to and attention was called to the fact that it was on file.

We are aware that the Charter provision for giving the preliminary notice was changed, by the Act of 1906, Chapter 328, from what it was when the *Burk case* was decided, and in that case an ordinance was attacked, but what was said there in reference to the effect of a map is still applicable. Filing the map does not do away with publishing the notice as required, but it can certainly be used when referred to in the advertisement to make it more readily understood. The trouble, if any, in this case would seem to be too much notice. While that is not before us, and hence we need not determine

it, we would not want to be understood as intimating that it is necessary to publish in the notice the courses and distances from beginning to end. As the course of the Parkway was changed at about the location of plaintiff's property, and elsewhere, from the course of Beech Avenue, and as several circles were to be included and at some places it was wider than 120 feet, it was doubtless deemed proper to publish the courses and distances, but whether done or not, it is clear that the map, which is required to be filed on or before the first day of the publication, can properly be referred to, and can be used as maps filed with deeds and other instruments are frequently used, to make the description in the published notice more easily understood.

4.   We can have no difficulty about treating a parkway or boulevard as a street, in condemnation proceedings under the Baltimore Charter.   Parkway is defined as "a boulevard; a street of special width, which is given a parklike appearance by planting its sides or center, or both, with grass, shade trees and flowers, and is intended for recreation and for street purposes."   29 *Cyc.* 1685.   While the term "boulevard" was originally used in a more special sense, it is now applied to "a street which is of especial width, given a parklike appearance by reserving spaces at the sides or center of shade trees, flowers, seats and the like * * * a broad street, promenade or walk, planted with rows of trees; a broad promenade or street * * * a broad city avenue specially designed for pleasure walking or driving, generally planted with trees, often in the center."   5 *Cyc.* 860, 9 C. J. 143 and *Haller Sign Co.* v. *Physical Culture Training School,* 249 Ill. 436, 34 L. R. A. (N. S.) 998; *City of St. Louis* v. *Handlan,* 242 Mo. 88. The provision in Section 6 (4) of the City Charter in reference to the purchase or condemnation of land for parks, squares, boulevards, parkways, etc., does not prevent the city from proceeding under Section 825 of the charter to condemn a parkway or boulevard, which is a street and a highway, and the provision in Section 14 of Article 33-A is not to have such a limited meaning as is contended for in this case.   At any

rate, No. 678 was approved before Article 33-A was passed, and there is nothing before us to show that any part of Gwynn's Falls Parkway, which could be claimed to be a "park" is affected by No. 169 or No. 170.

5. The appellant further contends that the attempt to change the location of parts of the proposed street while the proceedings for opening it under No. 678 was still pending and not completed, and to pass for that purpose No. 169 for closing part of the Parkway and No. 170 for the relocation of it, was *ultra vires* and void. It is alleged in the bill that the final and corrected award of damages and assessment of benefits under No. 678 was completed January 22, 1914, and on the next day the City Register gave notice that work under said ordinance had been completed, and that the parties affected thereby would have the right to appeal to the Baltimore City Court within thirty days after the first publication. The appellant was awarded $4,263 for the portion of his lot on the corner to be taken and a benefit assessed upon the remainder of that lot of $221. The Commissioners also provided that he could reserve the old building material on that lot. They awarded him $596 damages for the part of the other lot taken, and assessed benefits upon the remainder of $180. No appeal was taken by the appellant, although others did take appeals, amongst them Mr. Timanus, whose appeal was dismissed because not taken in time. *Timanus* v. *Baltimore,* 128 Md. 105. It is alleged that other cases were tried, but that the proceeding was never completed by causing the action of the court upon the appeals to be recorded in the book of proceedings of the Commissioners as provided by Section 179 of the Charter. Then ordinances No. 169 and No. 170 were approved July 14th, 1916, after notices were given and the maps filed. The former was "to condemn and close several portions of Gwynn's Falls Parkway, as now in process of opening, between the Western Maryland Railway and Liberty Heights Avenue, and between Allendale Street and Clifton Avenue," and the latter was "to condemn, open

and relocate Gwynn's Falls Parkway," between the same points.

The most important question in this connection is whether the city had power to pass ordinances No. 169 and No. 170, as the Parkway as located under ordinance No. 678 was not physically opened and in use. It is clear that the city could not have repealed No. 678 without affecting everything done under it. The record before us does not disclose just what proportion of the Parkway was included in the part between the Western Maryland Railway and Liberty Heights Avenue, but it must be towards the easterly end of the Parkway, as Liberty Heights Avenue is apparently at the beginning. (As the entire maps of the parkway were not filed we may not be accurate as to the points of the compass, but speak of the end towards Liberty Heights Avenue as the easterly end). The portion between Allendale Street and Clifton Avenue is, according to the plat inserted in the appellant's brief, towards the western end of the Parkway—Allendale Street being the first street easterly from Chelsea Street and Clifton Avenue being westerly of Chelsea Street and not very far from it, as compared with the whole length of the Parkway. It would seem, therefore, that in condemning a long highway like this the city should not be required to abandon the whole condemnation because it found it necessary or expedient to give up part that had been condemned, and to relocate it. Conditions may arise in the course of the construction of a long street like this, especially a parkway, which make it very desirable, if not necessary, to relocate some parts of it. It frequently happens in the condemnation of railroads and county roads that changes must be made in the location, and we see no reason why it cannot be done in reference to highways and streets in cities. As the city cannot repeal merely a part of an ordinance and keep the rest in force, if it becomes necessary or desirable to make some changes in the location of a part of a street, it would be helpless if it could not resort to such ordinances as No. 169 and No. 170.

There could be no material change under No. 678, contrary
to the ordinance and the notice of application to have it
passed, but new applications were made and new ordinances
were passed for the purpose of making such changes as were
made. It would be a useless and expensive procedure to re-
quire the city to first actually open the parkway and then
pass such ordinances as No. 169 and No. 170. It would be
a waste of public money, and might do the owners of prop-
erties which had been taken under No. 678 great injustice.
The doctrine of eminent domain does not contemplate taking
more lands or properties than are reasonably necessary for
the purpose for which they are taken. The Charter, Section
6 (26) (A), authorizes the City of Baltimore "to provide
for laying out, opening, extending, widening, straightening
or closing up, in whole or in part, any street, lane or alley
within the bounds of said city, which in its opinion the pub-
lic welfare or convenience may require." If instead of clos-
ing up a part of a long street after the procedure has gone as
far as this had under No. 678, it is thought proper to *extend*
it or *widen* it or *straighten* it, we can see no possible reason
why it could not be done—although the street was not then
actually opened, in the sense of using it, and the city would
certainly have equal power to *close* parts of it. Ordinances
169 and 170 were not passed until two years after the action
of the Commissioners for Opening Streets and if it be true,
as it might well be, that part of the long parkway was in
course of construction, a valid reason for closing parts and
relocating other parts might well arise. The attorneys for the
appellant cited *Baltimore* v. *Brengle,* 116 Md. 342; *Balti-
more* v. *Hook,* 62 Md. 371, and 15 *Am. & Eng. Enc. of Law*.
396, in support of their position that "a street cannot legally
be 'closed' until it has first been legally 'opened.'" The ques-
tion raised in the lower court in *Brengle's case* did not in-
volve the question now before us, as there the question was
whether Morris Avenue was a *public* highway, or simply *a
paper street* without anything having been done by the public
to acquire it. In *Hook's case,* the city was enjoined from the

enforcement of the payment of an assessment for grading, paving and curbing a portion of Caroline Street, which had never been acquired by the city by dedication, condemnation or purchase. It was simply marked on Poppleton's map as a part of Caroline Street. Of course, the enforcement of payment of assessments or taxes for such purposes could not be done under the circumstances. In 15 *Am. & Eng. Enc. of Law,* 396, it is said: "As a foundation for a proceeding to vacate there must be a highway actually existing," but on the next page it is said: "A road recently established will generally not be vacated unless new facts have arisen since its establishment, rendering it unnecessary or undesirable, but the fact that the road, though its opening was ordered, has never been actually opened does not affect the right to proceed to vacate it, and it has been held that the power to discontinue is not affected by the pendency of an appeal from the order of establishment or of a mandamus proceeding to compel the opening of a road which has been ordered." In 37 *Cyc.* 161, it is said: "The fact that a highway has not been opened or used will not prevent its alteration if the circumstances require it."

So although it may be unusual to adopt such measures, we cannot hold that they were beyond the powers of the city. Some of the objections urged might well have been raised on appeal to the Baltimore City Court, but being satisfied that the ordinances are not void for the objection now being considered, or any others presented by the record, we are of the opinion that the appellant had no valid ground for asking the interposition of a court of equity, unless it was to enjoin the city from taking possession of the property until the compensation was paid or properly tendered, which we will speak of presently. The appellant not only had the opportunity to appeal to the Baltimore City Court and, if not satisfied with its rulings, to this Court, in reference to ordinance No. 678, but he could have appealed from the action of the Commissioners under the other two ordinances, where he could prob-

ably have made all objections which could have been of any possible avail.

6. While the proceedings have been pending a long time, the record will not justify us in saying that the city was guilty of such laches as is referred to in *Wagner* v. *Bealmear & Son Co.*, 135 Md. 690, or similar cases.

7. We have thus passed upon the validity of the ordinances and have concluded that they are valid and not null and void as the plaintiff contended. He is, therefore, not entitled to the aid of a court of equity, unless the defendant undertakes to take possession of his property before paying or tendering the compensation he is entitled to, or paying the money into court under Section 827 of the Charter. We have already said that the injunction obtained under this bill was improperly granted, but apparently the parties desired to have the validity *vel non* of the ordinances passed on and we have done so—entirely concurring in the decree of the lower court which sustained the demurrer and dismissed the bill. We will, however, affirm the decree without prejudice to the plaintiff filing a bill for injunction, if necessary to prevent the city authorities from taking possession of the property before they are entitled to do so under the Constitution and laws of this State. It seems to us that it would have been far better for both parties to have proceeded with the case brought by the city under Section 827 and, if there was any real question about the amount due under the several condemnations, to have had that settled and the money paid into court. There could not have been any serious question about the "refusal to accept" on the part of the appellant, and if it was possible for him to raise any question before the court as to whether the money offered was a legal tender, it would have been easy to avoid that by getting money to which no one could object on that ground. But we do not understand that he had any right to make such objection at that time, as it was sought to pay the money into court under that section. The court does not inquire whether money so paid is a legal tender, and when it is paid to the clerk, or the officer who is the custodian of

such money, he deposits it in bank and he may never see any of that particular money again. It may be that the one entitled to it may demand money which is legal tender when he gets it under the practice in some jurisdictions, but we have never heard of such a demand or practice in this State. Of course, the court would not pass a decree under Section 827 until satisfied that the sum tendered was the correct amount and that there had been a "refusal to accept," or other cause authorized by the statute. The refusal to accept on the ground that the money was not legal tender was utterly inconsistent with the answer filed in that case by the appellant, in which he alleged that the ordinances were void. If they were, he was not entitled to any award. It may be a better practice to make a legal tender when that can be conveniently done, before asking for a decree permitting the money to be paid into court, although the position taken by the appellant in this case, as well as his answer in the other case, shows that such a tender would have been a useless proceeding before the validity of the ordinances had been sustained.

*Decree affirmed, the appellant to pay the costs.*