# LOUIS LIBERTINI ET AL. *v.* AUGUSTUS R. SCHROEDER, JR.

*Right of Way—Existing Public Way—Prescription—Implied Grant of Easement—Bona Fide Purchaser—Constructive Notice—Abandonment of Highway.*

Evidence of adverse user of land for a right of way cannot relate back of the time at which the land was divided into the asserted dominant and servient estates.    p. 489

That the user of a road was not by the public, but was by the owners of the properties through which the road passed, for purposes of access and egress, was not inconsistent with its continued existence as a public highway.    p. 489

Prescription does not run against the public to defeat its claim to a public road.    p. 489

A roadway over land retained by the grantor of adjoining land, *held* not to pass by implication as appurtenant to the land

conveyed, the private use relied on being of a non-continuous easement, and the granted land being readily accessible otherwise.                                                                  p. 491

One purchasing land is not charged with notice of the existence of a private way thereover, based on an estoppel against the vendor in favor of another, if, at the time of his purchase, the road in question is a public highway, and consequently the claimant's use thereof appears to be merely that of one of the public.                                                                  p. 492

A *bona fide* purchaser, for value, without actual or constructive knowledge, is not bound by any estoppel of his grantor to deny the existence of an easement upon the land purchased.

p. 492

An alteration of the location of a turnpike road, made by the State Roads Commission, after taking over the road under authority of Code, art. 91, sec. 29, operates as a discontinuance of any section of the turnpike thus abandoned.                  p. 494

Passage over a public highway for any length of time, however much in excess of an unbroken period of twenty years, cannot result in a private right of way over the land occupied by the highway, the law not permitting prescription for a privilege which is common to every one.                                p. 495

Upon the abandonment by the State of a section of a turnpike taken over by the State Roads Commission, the section abandoned reverts to the several and respective owners of the soil, free of all easements.                                        p. 496

The owner of the dominant estate may abandon an easement, if it sees fit, without the assent or concurrence of the servient owners, and without any actionable injury at common law, if the abandonment of the public easement leaves the servient estates so that they abut upon or may conveniently be reached by other public ways.                                                    pp. 496, 497

*Decided January 14th, 1926.*

Appeal from the Circuit Court for Baltimore County. In Equity. (PRESTON, J.).

Bill by Louis Libertini and others against Augustus R. Schroeder, Jr. From a decree dismissing the bill, plaintiffs appeal. Affirmed.

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Walsh, JJ.

*Horace T. Smith* and *Charles Ruzicka,* with whom were *Smith & Smith* on the brief, for the appellants.

*Edward J. Colgan, Jr.,* and *John B. Gontrum,* for the appellee.

Parke, J., delivered the opinion of the Court.

An amended bill in equity was filed by the appellants, Louis Libertini and Rose Libertini, his wife, and Catherine Elizabeth Reichert and Philip Reichert, her husband, against the appellee, Augustus R. Schroeder, Jr., alleging that an ancient road extending from the south end of the Belair Road Bridge over the Gunpowder River in a southerly direction across the land of Louis Libertini, thence over the adjoining land of Catherine Elizabeth Reichert, and thence through the adjacent land of Augustus R. Schroeder, Jr., and thence continuing through the successive lands of other owners, was the right of way of the appellants, Louis Libertini and Catherine E. Reichert, by adverse user; and that the appellee had obstructed the way so as to prevent the appellants from traveling over the same, to their irreparable injury. The particular relief prayed for was a mandatory injunction to require the appellee forthwith to remove the obstructions and to restore the way to its former condition; and an injunction to compel the defendant, his agents and servants, from any further obstruction of the way or interference with its use by the appellants. The court passed an order *nisi,* and the defendant answered, admitting the obstruction of the way claimed by the bill of complaint, but denying that the appellants had any right to the way, which was asserted to be an abandoned public highway, whose bed

had reverted to the respective owners in fee of the soil.   On
the issues thus made testimony was taken by the litigants
before the court, which passed a decree dismissing the bill
of complaint.

The present controversy carries us back to conditions
which existed many years ago, and which are now difficult
to re-establish through the imperfect medium of the recollec-
tion of aged witnesses as to what were exact conditions in
the days of their youth.   The incorporation of the Baltimore
and Jerusalem Turnpike Company on March 18th, 1867,
will serve as a convenient point at which to begin our state-
ment of the facts necessary to the presentation of the case.

By Chapter 143 of the Acts of 1867, the General Assem-
bly of Maryland incorporated the Baltimore and Jerusalem
Turnpike Company for the purpose, and with the power, to
grade and make a turnpike road "beginning for the same
at the limits of the City of Baltimore on the Bel Air Road
and running upon and occupying the said Bel Air Road from
the said city to the old stage or Camp Chapel Road, and
from thence on said Bel Air Road to the Little Gunpowder
Falls, with power to diverge from the bed of said road
when and where it may be desirable to said company, to
use and occupy a width of thirty feet on each side from
the center."   The company was granted the franchise to
collect toll, and the privilege of eminent domain, which
should "vest the title and interest of the owners thereof in
the property condemned in the said company."   Sections
3, 11, 13.   See *Douglass v. Boonsborough Turnpike Co.*, 22
Md. 219, 236, 237.

The turnpike company built the turnpike for eight miles
from Baltimore on the road-bed of the Bel Air Road and
there stopped.   The terminus of this paved surface was
about one mile south of the property now owned by the
appellee, and at the northwest corner of this property the
Bel Air dirt highway forked.   The continuation of the road
in a straight line, over a hill through the present Schroeder,
Reichert, and Libertini properties, and a fourth tract, to

the bridge carrying the Belair Road over the Gunpowder Falls, formed the right or eastern branch of the fork; and its left or western branch was the route around the hill and along the northwestern boundary lines of the three tracts of land now owned by the appellants and appellee, whence it turned sharply to the east and united with the right branch of the fork at the public bridge. These branches separated at an acute angle and, at their point of greatest divergence, were never more than approximately three hundred and fifty feet apart. This was the situation when the turnpike company was incorporated, but the record does not disclose how long it had previously subsisted.

It does appear that the right branch was the original line of the Bel Air highway, but when its surface way became so bad as to cause a deflection of public travel to the left branch cannot be determined from the record. The testimony of all the witnesses was that since 1859 to 1886, or the year in which the right branch was improved by the turnpike company, there had been no public travel on the right branch, but that as early as the year 1859 the public use was by the left branch around the hill. Only the appellant Philip Reichert can go so far back. In that year he was a youth of ten years, and it was at this tender age that four other witnesses, Catherine Elizabeth Reichert, who is an appellant, John C. Halbert, John Furnkase, and John Dunty, speak as to like conditions of public travel from 1861, 1864, 1865 and 1866 respectively, to about 1886. How long before these years the public had traveled the left branch of the fork because of the condition of the way on the right branch, there is no satisfactory proof.

It is over this unused portion of the original Bel Air public highway, which we have for convenience named the right branch, that the appellants, Louis Libertini and Catherine Elizabeth Reichert, claim a private right of way. In support of their position they go back as far as 1859 to show acts of user by their predecessors in title. Any such proof prior to the second half of the year 1866 must be the result

of an imperfect memory, because all the land in controversy was but a single tract, which was owned until February 6th, 1850, by Harry D. G. Carroll, and from that year until 1866 by Robert G. Purviance and others. *Mitchell v. Seipel,* 53 Md. 263; *Stewart v. May,* 119 Md. 18, 19; *Capron v. Greenway,* 74 Md. 293.

1. The first severance of this tract was under the deed of Robert G. Purviance and others to John Schroeder for sixty acres, three roods and twenty-nine perches of land, more or less. The deed is dated June 22nd, 1866, but the acknowledgment of Purviance was not until August 15th, 1866. The next deed was by Robert G. Purviance and others to Benjamin Marple, dated June 28th, 1866. As the deed to John Schroeder embraced the appellee's parcel and that owned by the appellant Catherine Elizabeth Reichert, and the deed to Benjamin Marple included the farm of the appellant Louis Libertini, it is a necessary conclusion that all evidence of an adverse user by John Schroeder and Benjamin Marple and their successors in title must relate, at the earliest, to the period beginning after June 25th, 1866, when there was a division in the ownership of the land, which then included both the asserted dominant and servient estates.

2. After June 25th, 1866, and until the year 1886, the evidence must be considered to have established that the right branch of the road was not used by the public but by the owners of all the properties through which the right branch passed to the public bridge over the Gunpowder Falls. This user was for access and egress to and from their farms and public ways and places and was in no respect inconsistent with the continued existence of a public highway. *Canton Co. v. Baltimore,* 106 Md. 100; *Baugh v. Arnold,* 123 Md. 7. Moreover, prescription does not run against the public to defeat its claim to a public road. *Brady v. Baltimore,* 130 Md. 513; *Cushwa v. Williamsport,* 117 Md. 318, 319; *Ulman's Case,* 83 Md. 144, 145; *Sapp v. Northern Central Railway Co.,* 51 Md. 115; *Patapsco Co. v. Baltimore*

*City,* 110 Md. 311; *Baldwin v. Trimble,* 88 Md. 402. Let us assume, however, that the public had abandoned the right branch of the fork so that the soil had reverted to the owners, and was, therefore, subject to the operation of adverse possession. On this assumption, the proof is that the right branch was cleared for a width of sixty feet, graded, improved and opened to public travel as a part of the turnpike road, some time in 1886. Hence it cannot be said that the requisite period of twenty clear years of adverse user has been established by the appellants, who bear the burden of proof.

3. However, the appellant Catherine Elizabeth Reichert, who acquired her tract of land from her brother, Augustus Schroeder, Sr., on June 16th, 1875, when the land she purchased was unimproved, set up towards the close of the case a right to use the road over the remaining land of Augustus Schroeder, Sr., by reason of these circumstances. The appellant's husband, Philip Reichert, was in the course of the negotiations with Augustus Schroeder, Sr., for the purchase of the land, which, as we have stated, bounded on the left branch of the fork of the Bel Air Road, and was traversed by the right branch, when the husband inquired about an outlet, and he swore, in effect, that the vendor showed him a plat of the farm with the roadway in question and told him that he could use the right branch of the fork to the Bel Air Road "my life time and forever." The wife's evidence substantially is that her brother told her she could use this roadway through his place until the end of time. These conversations were before the purchase by the appellant, who would not have bought the property without the roadway in question. The deed, however, did not mention the right of way, and the appellant Catherine Elizabeth Reichert relied upon an easement by implication or by estoppel, upon the theories (a) that the roadway was an easement whose use was continuous and apparent, and necessary for the reasonable enjoyment of the land conveyed; and (b) that a vendor is estopped to deny the exist-

ence of a subsisting way upon the assurance of whose con-
tinuance and right to use the vendee made the purchase.
See *Gosnell v. Roberts,* 147 Md. 625.

A. At the time of the grant in 1875, this road was used
by Schroeder as an ordinary farm road or outlet, and was
not a way of necessity. The parcel of land under treaty
had never been divided or used as a separate piece of prop-
erty, but as a part of the whole farm, and was laid off for the
purpose of that particular sale immediately before the deed
to the buyer, and was bounded by the left branch of the
fork, which was then a public way, only a short distance
west of the way in dispute, and egress over the land pur-
chased to the then public road (now the improved state
road) was of comparatively easy and convenient access. The
physical conditions of the surface of the Reichert property
were the same in 1875 as now, and the conclusion of the
learned chancellor below, after hearing the testimony on
the subject and making, in company with counsel for the
respective parties, a personal inspection of the premises, is
thus expressed in his opinion giving his grounds for his
denial of the injunction sought: "A view of the land leads
me to believe that this will work little or no hardship to the
complainants, as the new state road passes right by these
properties, improvised ways to the state road have already
been created, and with very slight expenditure, can be made
into good and practical entrances." It does not seem to us
that the evidence furnishes any sufficient reason to disturb
this finding or to hold that under the deed of 1875 the
way over the remaining Schroeder land passed by legal
implication as appurtenant to the estate of the Reichert
grantee. The proven private use relied on was of a non-
continuous easement. *Oliver v. Hook,* 47 Md. 307; *Duvall
v. Ridout,* 124 Md. 193, 197; *Washburn on Easements* (4th
Ed.), pp. 106, 107; *Lippincott v. Harvey,* 72 Md. 572, 579;
*Gulick v. Fisher,* 92 Md. 353; *Howard v. West Md. Ry. Co.,*
138 Md. 49.

B. If the testimony of the Reicherts be given its full

weight, and on it the vendor be held estopped to deny the right of the appellant, Catherine Elizabeth Reichert, to use the way over his property, yet the vendor, some time before his death, sold and conveyed, on September 1st, 1911, for value, the alleged servient estate to his son, Augustus R. Schdoeder, Jr., the appellee, who knew nothing of the conversations and facts relied upon here to raise an estoppel for the benefit of the Reichert property exclusively. His first knowledge of the road was after 1886, when the road was concededly maintained as a public thoroughfare or turnpike by the turnpike company. The use was by every one, and that of the Reicherts was no different from every other abutting landowner or person similarly situated, having occasion to travel on this public highway. The obvious and apparent way was not a private one of the Reicherts, but a public thoroughfare and toll road. Consequently, the use by the appellant, Reichert, was not of a kind to apprise the appellee that it was dependent upon, and in the assertion of, an oral agreement for a private way, whose existence was meanwhile negatived by the constant and visible conditions of public travel. It follows that without actual or constructive knowledge, the appellee as a *bona fide* purchaser for value was not bound by any estoppel of his grantor. 2 *Tiffany on Real Property* (2nd Ed.), sec. 546, p. 2138; *Ewart on Estoppel,* 196; *Day v. Allender,* 22 Md. 512, 529; *Hays v. Richardson,* 1 G. & J. 366, 385, 386; *Baltimore and Hanover R. R. Co. v. Algire,* 63 Md. 323.

4. Whatever may have been in 1886 the nature of the use of the right branch of the fork in the Bel Air Road, a complete alteration of its physical condition occurred in that year. The cause and manner of the change is clearly narrated by Van Brandt Rittenhouse, who at the age of eighty-three years testified for the appellants. He moved into the neighborhood in 1880, and at once became familiar with the conditions. Mr. Rittenhouse stated that he was informed that the right branch was the original Bel Air Road, and that it had been on its then roadbed for

over one hundred years. When he saw it in 1880 it had not been used for public travel for a long time on account of its bad condition, which had caused the diversion of the traveling public to the left branch of the fork. Mr. Rittenhouse did not know how long this diversion had existed, but while the right branch was thus "temporarily out of repair," as the witness expressed it, the left branch became impassable and Mr. Rittenhouse and several others went before the grand jury to have the turnpike company indicted for maintaining a nuisance. This resulted in the explanation by the turnpike company that the turnpike had not been built for lack of funds, in the election of Rittenhouse and some of his neighbors as directors, and in the completion of the final section of the turnpike to the bridge over the Gunpowder Falls.

The officers of the company understood that the right of way granted them was the original route of the Bel Air Road, and, before beginning the construction, the president, Mr. Rittenhouse, and all the other directors, went over the ground, and decided that the turnpike must be built on the right branch of the fork, as this was the true location of the Bel Air Road, within the meaning and intent of the General Assembly of Maryland. The turnpike was accordingly laid down, sixty feet in width, on the line of the eastern branch, as a matter of right under the franchise from the State to use the bed of the public road. Nothing was paid to any land-owner, and the work was completed without interference or protestation, except that, after the public began using the turnpike, a property owner, between the Gunpowder Falls and the land now owned by Libertini, obstructed the way through his property, was arrested, and then abandoned his objection.

The turnpike company paved the roadway in 1886 and, until the 24th of March, 1911, when the company surrendered its franchise and granted its road-bed unto the State of Maryland, acting by the State Roads Commission, this right branch or original line of the Bel Air Road was main-

tained for public use. The transfer to the State was for the purpose of converting it into a free highway to be rebuilt and maintained by the State, under the jurisdiction of the State Roads Commission, which had been granted the power to acquire turnpike roads "with full power to widen, relocate, change or alter the grade or location thereof." Code, art. 91, secs. 29, 28; *Ches. and Pot. Tel. Co. v. State Roads Commission,* 134 Md. 6, 7. In the exercise of its power, the State Roads Commission changed or relocated the route of the turnpike road. It abandoned the right branch of the fork, and its method of construction of the improved road left the northern end of the right branch, near the bridge, impassable for travel. The selected location of the state highway is on the bed of the left branch of the fork, binding upon the northwestern boundary lines of the two tracts owned by the appellee, and the appellant Catherine Elizabeth Reichert, but after passing the Reichert land, the state highway veers slightly to the east, leaving the line of the left branch and passing through the Libertini farm nearly midway between the two branches of the fork. The state highway was opened for public travel on this route in 1914-1915.

From the opening of the turnpike road in 1886 until its being closed by the State in 1914 or 1915, the public used this turnpike for public travel, and among those using the turnpike highway were the appellants. After the state highway was completed in 1914 or 1915, the public used that highway, but the appellants continued to use the abandoned section of the turnpike or the right branch of the fork until some time in 1923, when the appellee stopped this use by an obstruction.

5. The alteration of the location of the turnpike road was made by competent authority, and it operated as a discontinuance of that section of the turnpike which was thus abandoned. Code, art. 91, sec. 29; *Jenkins v. Riggs,* 100 Md. 427; *Bouis v. Baltimore,* 138 Md. 294; *Baltimore v.*

*Brengle,* 116 Md. 347, 351; *Ches. & Pot. Tel. Co. v. State Roads Commission,* 134 Md. 6, 7.

6.   The appellants contend that the abandonment of this section as a public way did not affect their rights to continue to enjoy it as a private way, and that there was no actual break in their user by the completion in 1886 for public travel of the remaining section of the turnpike.   The appellants seek to fill out the requisite period of adverse user by tacking to their enjoyment of the roadway before 1886, enjoyment, in common with the public, of the roadway after 1886.   But the law does not permit prescription for a privilege which is common to every one; and so, passage over a public highway for any length of time, however much in excess of an unbroken period of twenty years, cannot result in a private right of way over the land occupied by the highway.   *Washburn's Easements and Servitudes* (4th ed.), 98, 165, 162, 257; *Sapp v. Northern Central Ry. Co.,* 51 Md. 115; *Ulman's case,* 83 Md. 144, 145; *Cushwa v. Williamsport,* 117 Md. 318, 319; *Brady v. Baltimore,* 130 Md. 513.

One of the necessary elements of prescriptive title is that the use and enjoyment of the way over the servient estate must have been with the knowledge and acquiescence of its owner, or have begun to work some injury to his rights of property of which he might be cognizant.   Here the subject matter of enjoyment was in common with the public, and was in its nature inseparable, though crossed by the property lines of successive servient estates.   The use here by one property owner, through whose land the public way passed, was in no way distinguishable from the use of any other like property owner, and of the public generally.   The owners of the servient estate had no means at their command to resist this enjoyment, especially when its nature gave no indication that it was the assertion of a private right.

7.   The turnpike company was granted in 1867 a franchise by the State to occupy for its corporate purposes the bed of a public highway.   The company had not lost its franchise in 1886, and pursuant to the terms of the grant it completed the turnpike to the Gunpowder Falls.   If its construc-

tion was, as the company believed, on the road-bed of the
Bel Air Road, the location was within the letter and spirit
of the grant, and the company's action was under a claim of
title by virtue of a grant. *Douglass v. Boonsborough Turn-
pike Co.,* 22 Md. 236. If the discontinuance of the public
use had been of such a nature as to cause the title to the
roadway to revert, or if the assertion by the company that
the route was a section of the Bel Air Road was unfounded
in fact, the occupancy was nevertheless under a claim of
right and adverse to the owners of the land affected. The
company, without any other grant than that of the State,
without condemnation or payment of compensation, took pos-
session and occupied in 1886 this section of roadway in dis-
pute. The company cleared the ancient road of all growth
to the uniform width of sixty feet permitted by the grant;
moved back about ten feet the house on the present Libertini
farm so as to get it off the right of way; improved the road-
way, reduced the grade on the hills, and laid the turnpike,
with the object and privilege of collecting toll for its use,
which was by the public. *Patapsco Co. v. Baltimore,* 110
Md. 311; *Douglass v. Boonsborough Turnpike Co.,* 22 Md.
236. The occupancy of the way was, therefore, exclusive of
any easement of private way, continuous, open, uninter-
rupted, and notorious for more than twenty successive years
before its abandonment by the State in 1924. During the
period since 1886 to 1924 no one can question that the sec-
tion of the roadway in dispute was a public highway. *Day
v. Allender,* 22 Md. 511, 525, 529; *Thomas v. Ford,* 63 Md.
352; *Carroll Co. v. Rickell,* 146 Md. 468; *Murphy v. Bates,*
21 R. I. 89.

8.   Upon its abandonment by the State, this section re-
verted to the several and respective owners of the soil, free
of all easements. The landowners here owned the fee sub-
ject to the easement in favor of the public. Theirs are the
servient estates and it is sound and accepted law that the
owner of the dominant estate may abandon an easement, if
it sees fit, without the assent or concurrence of the servient
owners, and without any actionable injury at common law,

if the abandonment of the public easement leaves the servient estates so that they abut upon or may conveniently be reached by other public ways. Not only are the parcels in controversy left with access and egress to and from another public way, but their respective northwestern property lines bind on the same public highway with reference to which the three tracts were conveyed in 1886 in two separate parcels to Benjamin Marple and John Schroeder. The only change in the highway binding on these tracts is that it is now an improved state road along all the front of the appellee's and the Reichert's farms. Under these circumstances, it is not apparent how the appellees sustained any substantial injury by the action of the State Roads Commission in its authorized abandonment of that section of the turnpike which passed through the farms of the appellants, but that question is not involved on this appeal. *Baltimore v. Brengle,* 116 Md. 351; *Houck v. Wachter,* 34 Md. 265; *German Evangelical Lutheran Cong. v. Baltimore,* 123 Md. 142; *De Lauder v. Baltimore County,* 94 Md. 1.

The cases cited on the brief of the appellants have been given careful consideration, but different facts controlled and distinguished those decisions from the record before the Court on this appeal; and they do not furnish any basis for a reversal.

The appellants objected frequently to the rulings of the court on the evidence, as is indicated throughout the record by the notation, following a question, "Objected to; overruled; exception noted." Nothing further was done at the conclusion of the testimony, and on April 17th, 1925, the opinion of the court was filed. The typewritten transcript of the testimony before the court was filed on July 29th, and the next day the appellants filed, after the hearing, written exceptions to forty-two rulings on evidence which was admitted on the theory that it tended to prove the use of the way was permissive. The testimony objected to has been excluded from the consideration of this case without reference to its admissibility, so the appellants have not suffered by any of the rulings complained of.

*Decree affirmed, with co.t.*