POTOMAC EDISON CO. *v.* ROUTZAHN ET UX.
ROUTZAHN ET UX. *v.* POTOMAC EDISON CO.

[No. 96, October Term, 1948.]

450

*Decided March 9, 1949.*

*Rehearing Denied April 26, 1949.*

The cause was argued before MARBURY, C. J., DELA-
PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*W. Clinton McSherry* for the appellant.

*Robert E. Clapp, Jr.,* for the appellees.

MARKELL, J., delivered the opinion of the Court.

These are cross-appeals from an order granting an in-
junction directing defendant to discontinue transmission
of electricity and remove from the poles on certain real
estate the wires and other equipment for that purpose,
with leave to defendant to remove the poles and also
stone and dirt fill and stone and concrete abutments, the
order to be suspended pending condemnation proceedings
if defendant shall within thirty days institute such pro-
ceedings to acquire the right to maintain a line or lines
for transmission of electricity on or across the real estate,
together with the right to continue on the real estate
the poles and the fill and abutments.  Defendant appeals

from the granting of the injunction, plaintiff from failure to require removal of the poles and the fill and abutments.

In 1896 Herman L. Routzahn and wife by deed granted and conveyed to Frederick and Middletown Railway Company, incorporated in 1894, "a right of way for all the purposes of constructing, maintaining and operating a Railroad, (and none other), over and to" a strip of land, 30 feet wide and 2,472 feet long, along the north side of "the National Turnpike Road" (now a State road), between Frederick and Middletown, just east of Middletown, "with the reservation that in the event said Railroad intended to be constructed upon the land hereby conveyed, should cease to be maintained and operated, as such, the said Right of way hereby intended to be conveyed shall revert to then owner or owners of the land over and through which said right of way passes." The railway company covenanted "to maintain a free and unobstructed crossing on and over said Railroad at the present grade with approaches on either side," at a point 365 feet from the west end of the right of way, and "an undergrade crossing under said Railroad, with approaches on either side," at a point 115 feet east from the middle of a certain stream over which the railroad was to cross, "said undergrade crossing to be not less than 14 feet high unobstructed (at the present grade which is to be maintained), and not less than 16 feet wide, clear of all obstruction."

Routzahn was an incorporator, and until 1901 treasurer and a director, of the railway company. He died intestate on October 5, 1935. Plaintiffs, his son and the son's wife, are successors in title to land, on both the north and south sides of the road, through which he had granted the right of way. Defendant, through successive consolidations, is the successor to the railway company and other electric street and interurban railway, and light and power, companies in Frederick or Washington County or both, including all the companies we shall mention. The railway company constructed on the right of way a stone and dirt fill, a trestle (now dis-

mantled) and stone and concrete abutments, (which formerly carried the ends of the trestle, where a stream enters through the right of way) and cross-ties, tracks, poles, wires and other equipment for the operation of an electric railroad. The railroad was maintained and operated by the railway company, defendant and its intermediate predecessors until October 1947, when with the permission of the Public Service Commission defendant abandoned maintenance and operation of it. Defendant has since removed the rails and some wires and other equipment, but has left the poles and other wires and equipment and the fill and abutments formerly used as a base for the tracks. Plaintiffs allege that the poles, wires, fill and abutments and other equipment deprive them of their right of access from their lands to the highway and their right to develop their lands as building lots. They pray that defendant may be required to remove the poles, wires, reinforced fill and other equipment and pay damages for trespasses committed by it and may be enjoined from committing further trespasses. Defendant admits that it intends to continue to maintain its poles, wires and appliances on the right of way, but denies that it intends to maintain the reinforced fill and abutments.

In 1909 the railway company and several other companies were consolidated to form Frederick Railroad Company. Frederick Railroad Company owned the stock of the Frederick electric company. It obtained the power for its railways from a direct current generating plant of the electric company between Frederick and Middletown. The only wires then carried on the double line of poles on the railway right of way were span wires, from pole to pole, that supported the trolley wire. Electricity for street lighting and domestic and commercial use in Frederick was furnished by the Frederick electric company from its generating plant in Frederick and over its distribution system. In 1911 it extended its distribution system to Braddock Heights. In 1912 it extended its service for public and private lighting to Middletown. To do this it built a 2,200-volt line on the trolley poles

to carry electricity from the Frederick generating plant. At the east end of Middletown the electricity was, through transformers, reduced to low voltage and was distributed in Middletown.

In 1912 Frederick Railroad Company and the Hagerstown railway company formed the Frederick and Hagerstown power company, to construct a large power plant at Security, near Hagerstown, to furnish power to both the Frederick and Hagerstown railways and to sell power to industries and local distributing companies or municipalities along its lines. The power from Security was transmitted, over high tension transmission lines, from Security to Hagerstown and from Security through Smithsburg and Thurmont to Frederick and on the railway right of way from Frederick through Middletown to Hagerstown, a "loop" of some 75 miles. The Security plant and the high tension lines began service in January, 1913. The generating plants at or near Frederick were abandoned, and the power from Security was used to operate both the trolley lines and the electric lines. To construct the high tension power lines on the railway right of way, every alternate pole already on the right of way was taken down and replaced by a taller pole.

In April, 1913 Hagerstown and Frederick Railway Company was formed by consolidation of Frederick Railroad Company, the Hagerstown railway company, the Frederick and Hagerstown power company and other companies; in 1922 its name was changed to Potomac Public Service Company, and in 1923 it was consolidated with another corporation to form defendant. By section 359-B of Chapter 796 of the Acts of 1914 the municipality of Middletown was empowered to contract, and grant franchises, for lighting the streets or supplying the town or the residents thereof with electricity. On February 23, 1915 the municipality contracted with, and granted a franchise to, Hagerstown and Frederick Railway Company for lighting the streets for ten years and furnishing current for light and power purposes to the citizens for twenty years. On April 9, 1915 the exercise of the fran-

chise was "permitted and approved" by the Public Service Commission. In 1911 or 1912 six residents of Middletown (apparently including the burgess and one or more commissioners) had signed a request to the Frederick electric company that it extend its lines into Middletown and erect poles and all construction work necessary to operate street lights and supply electricity to residences, in consideration of which extension and construction work and the supplying of electricity to the municipality "as per offer" made by the electric company to the municipality and accepted by it, the six "jointly and severally obligated themselves" to pay the agreed monthly price for street lighting so long as the electricity would be furnished by the electric company to the municipality "and until this contract will be superseded by a further contract" to be made by the muncipality with the electric company, "to be authorized by an Act of the General Assembly", which the six would seek to obtain at the 1912 session. Apparently the 1915 contract and franchise, three years after service to Middletown had been begun, reflects lack of power in the municipality to make such a contract and grant such a franchise in 1912.

A railway between Frederick and Thurmont, which was begun by the Frederick and Thurmont railway company, incorporated in 1898, is still operated by defendant with power received from Security over the "loop" which includes the railway right of way from Frederick to Middletown.

Defendant demurred to the bill "for the reason that questions of title to interests in real property are not determined in injunction proceedings." "It has long been recognized that, though 'a fugitive and temporary' trespass will not be enjoined, a continuing trespass will be enjoined if it 'will be ruinous or irreparable or would impair the just enjoyment of the property.' *Story, Equity Jurisprudence*, 1835; 13th Ed., 1886, § 928; *White v. Flannigan*, 1852, 1 Md. 525, 54 Am. Dec. 668; * * * *Baltimore Butchers Abattor & Live Stock Co. v. Union Rendering Co.*, 179 Md. 117, 120, 17 A. 2d 130, * * *."

*Needle v. Scheinberg,* 187 Md. 169, 173, 174, 49 A. 2d 334. This court has sustained the right to an injunction against invasion of property by construction of a railroad switch or siding on an abandoned right of way, *Hagerstown and Frederick Railway Company v. Grove,* 141 Md. 143, 118 A. 167, or laying of water pipes, *Baltimore County Water Company v. Dubreuil,* 105 Md. 424, 66 A. 439, 6 L. R. A., N. S., 684, or erection of poles and wires, *American Telephone and Telegraph Company v. Pearce,* 71 Md. 535, 18 A. 910, 7 L. R. A. 200; *Potomac Electric Power Company v. Wall,* 153 Md. 229, 137 A. 899; *Chesapeake & Potomac Telephone Company v. Tyson,* 160 Md. 298, 153 A. 271, without authority. In some of these cases the specific question of jurisdiction in equity was not raised. This court has also had occasion to reaffirm the general rule that when title to real estate is in dispute, and no irreparable damage from the delay in a suit at law is to be feared, the proper jurisdiction is at law, *Schultz v. Kaplan,* 189 Md. 402, 408, 56 A. 2d 17, 20, and to apply this rule to a dispute over a claim of an easement by deed and an opposing claim of adverse possession free of the easement. *Finglass v. George Franke Sons Co.,* 172 Md. 135, 190 A. 752. In *Metaxas v. Easton Publishing Co.,* 154 Md. 393, 399, 400, 140 A. 603; *Metaxas v. Jarrell* Co., 164 Md. 180, 164 A. 232 this rule was applied to a disputed claim of a prescriptive easement, but jurisdiction in equity was sustained to avoid multiplicity of suits, *viz.,* and action on the case for invasion of the easement and an action of trepass or ejectment for land claimed in fee—which under present rules of procedure could be joined in one suit. *Bachman v. Lembach,* 192 Md. 35, 42, 63 A. 2d 641, 644. In any event the rule is not inflexible; questions of title, when free from reasonable doubt, are frequently decided by courts of equity. *Smith v. Shiebeck,* 180 Md. 412, 418, 24 A. 2d 795. In the instant case there are few, if any, questions of fact which would be decided by a jury. Moreover, the question whether defendant is obligated to remove the fill and abutments after abandonment of the railroad and can

be compelled to do so by mandatory injunction is an equitable question, distinct from the question whether defendant has a prescriptive easement to maintain light and power lines. Defendant also, in the event of an adverse decision, would need (and under the order below virtually received) injunctive relief pending condemnation proceedings. *Potomac Electric Power Company v. Wall, supra,* 153 Md. at page 235, 137 A. 899; *Chesapeake and Potomac Telephone Company v. Tyson, supra,* 160 Md. at page 302, 153 A. 271. In sustaining jurisdiction in equity on these grounds, we do not hold that it is not directly sustained by cases above cited.

Defendant contends that in its present operation of the railway between Frederick and Thurmont, by power carried over the "loop" which includes the right of way in question, it is using, and has not abandoned, the right of way, and therefore the right of way has not reverted to plaintiffs. We may assume, without deciding, that a franchise to use the streets of a city for a street railway is a unit and includes the right to use one street for wires to operate a railway on another street. *Brandt v. Spokane etc. R. Co.,* 78 Wash. 214, 138 P. 871, 52 L. R. A., N. S., 760; *Eureka Real Estate Co. v. Southern R. E. Co.,* 355 Mo. 1199, 200 S. W. 2d 328. This assumption does not help defendant's contention by furnishing a construction of the deed of the right of way. The deed grants a right of way for all the purposes of constructing, maintaining and operating a railroad (and none other) "over and to" the strip of land described. In the event that "the railroad intended to be constructed upon the land hereby conveyed" should cease to be maintained and operated, as such, the right of way "shall revert". The event specified has occurred; the railroad constructed on the right of way has ceased to be maintained and operated as such. The right of way has reverted. The deed was executed two years before the Frederick and Thurmont railway company was incorporated. In the construction of the deed the Thurmont railway is irrelevant.

Equally unfounded is plaintiffs' contention that defendant is obligated to remove the fill and abutments which were constructed as a suitable roadbed, at suitable grade, for the tracks—and as an aid to maintenance of the undergrade crossing called for in the deed. We may assume, without deciding, that if the deed imposed such an obligation on the grantee the obligation would run with the land and bind and enure to the benefit of the successors in interest to grantor and grantee, and that (as is conceded and contended by plaintiffs) defendant has a right to remove the fill and abutments. But even on these assumptions, the deed does not impose such an obligation. Plaintiffs rely on the right of a tenant to remove "trade fixtures", the analogous right of a licensee upon revocation of his license, *Northern Central Railway Co. v. Canton Co.*, 30 Md. 347, and "the expectation of the law [commonly based on express covenant] that a tenant shall ordinarily surrender possession of the premises at the expiration of his term in the same, and as good, condition as when he received possession." *Baltimore & Philadelphia Steamboat Co. v. Starr Methodist Protestant Church*, 149 Md. 163, 178, 130 A. 46, 51; *cf. Crowe v. Wilson*, 65 Md. 479, 483, 5 A. 427, 57 Am. Rep. 343. Neither the act of abandonment of an easement ordinarily, *Libertini v. Schroeder*, 149 Md. 484, 496, 497, 132 A. 64, nor the terms of the deed in the instant case, give rise to any actionable injury or an obligation to restore physical conditions at the time of the grant of the easement. Whether technically a railroad right of way is only an easement or is something more, and the reversionary interest is a reversion or only a possibility of reverter, for practical purposes the right of way is a permanent, though defeasible, interest in a new use which requires change in the physical condition of the land. This deed recognizes the permanent character of the grant in two covenants, for the benefit of the adjoining land, for a grade crossing and an undergrade crossing, and its defeasible character in the provision for reverter in the event of cesser of use. The deed imposes, through-

out the permanence of the right of way, an obligation, which involves expense, to maintain the crossings, but in the event of cesser of use provides only for reverter of title and imposes no obligation or expense as to the physical condition of the land. The express covenants in the deed leave no room for adding by implication a covenant to remove the fill and abutments.

There remains the question whether defendant has an easement by prescription to maintain light and power lines on the former railroad right of way. If it has not an easement by prescription, it has no easement at all. As we have said, the deed granted a right of way only for the purposes of maintaining and operating a railroad there, not for maintaining power lines, even though defendant uses some of the power to operate a railroad elsewhere. The railroad right of way has reverted. In this respect the scope of the railroad right of way granted by deed is similar to the scope of an electric highway franchise. Use of either a city street or a country highway for an electric railway, including erection and maintenance of poles and wires, is within the public highway easement and imposes no additional servitude on the owner of the fee in the highway or of the abutting land. *Lonaconing Railway Company v. Consolidated Coal Company*, 95 Md. 630, 53 A. 420. Use of a railroad right of way for telegraph and telephone lines for railroad business is within the rights obtained by grant or condemnation, but such use for general commercial business of a telegraph or telephone company constitutes an additional servitude upon the land subject to the right of way, for which the landowner is entitled to redress at law or by injunction. *American Telephone & Telegraph Co. v. Pearce, supra.* Likewise, on a country highway at least, telegraph or telephone or power lines for other than railway purposes constitute an additonal servitude for which the landowner is entitled to compensation or injunctive relief. *Potomac Electric Power Co. v. Wall, supra; Chesapeake & Potomac Telephone Co. v. Tyson, supra.*

"In order to establish an easement by prescription, it is necessary to prove an adverse, exclusive and uninterrupted use of the way for twenty years. Adverse use means use without license or permission. Where a person has used a right of way for twenty years unexplained, it is fair to presume that the use has been under a claim of right, unless it appears to have been by permission. *Cox v. Forrest,* 60 Md. 74, 79; *Smith v. Shiebeck,* 180 Md. 412, 24 A. 2d 795." *Condry v. Laurie,* 184 Md. 317, 321, 41 A. 2d 66, 68. "* * * when a person has used a road over the land of another openly and continuously and without objection for twenty years, it will be presumed that the use has been adverse under a claim of right, unless it appears to have been by permission. To prevent a prescriptive easement from arising from such use, the owner of the land has the burden of showing that the use of the way was by license inconsistent with a claim of right. *Cox v. Forrest,* 60 Md. 74, 80; *Condry v. Laurie,* 184 Md. 317, 41 A. 2d 66." *Wilson v. Waters,* 192 Md. 221, 227, 64 A. 2d 135, 137.

Plaintiffs contend that: Use of the right of way by defendant and its predecessors for the power lines was not open and adverse, but was permissive; originally at least, it was within the scope of the grant by deed. Surreptitious or concealed use, or use merely incidental to the main use, cannot give rise to a prescriptive easement. *Pierce v. Cherry Valley Farms,* 76 Ohio App. 58, 63 N. E. 2d 46, affirmed 146 Ohio St. 400, 66 N. E. 2d 639. Under the grant of the right of way the grantee had a right to provide for the future growth of its railway business and to erect and maintain a power plant to generate electricity to provide power for all its railway purposes and to sell its excess power not needed for its immediate use to industries along its line, or to sell to a power company such excess power, to be by the power company distributed and sold on its own account to such industries. Such a railway company has a right to build structures of this kind that are reasonably necessary to transact its business and to enable it to accomplish the purposes of its creation.

It is expected at all times to equip itself to handle and provide for not only its present business requirements but any reasonably probable growth in the future. It was reasonably necessary for defendant's predecessor, in the first place, to equip its plant and to generate excess power to care for the future growth of its business, and if it acted on that necessity in good faith it had the right to erect the power lines and to make an arrangement with a power company to purchase from it, temporarily, such excess power for distribution to private customers. The question is whether or not the power lines were erected with a view to be used by the railway company in the future in its business as a railway or whether such construction was solely for the use of a power company in the pursuit of a different business from railway business and for the profit of both companies. If the power lines were constructed with the latter motive they were not within the grant of the right of way, but if for the former reason they were and no additional servitude was imposed on the land. *Dickman v. Madison County Light Co.*, 304 Ill. 470, 481, 482, 136 N. E. 790, citing *American Telephone and Telegraph Co. v. Pearce, supra.*

Assuming, without deciding, that plaintiffs' contentions are a legally sound conclusion from their premises, there is no factual basis for their premises. In substance and in form, the nature, purposes and effect of the formation of the Frederick and Hagerstown power company and the construction of its plant at Security and its "loop" of power lines was not provision for future growth of the railway business with temporary incidental sale of excess power for general power purposes, but was creation of a new power company with a large new plant and high tension transmission lines to handle the already existing and expanding light and power business. The railway business was to get cheaper and adequate electric service in lieu of its then inadequate service and was to furnish the power company its largest original customers but was not expected to use all or most of the power. The power business was not temporary or incidental to the railroad

business , but the railroad business in a few years became incidental to the power business. When Hagerstown and Frederick Railway Company was formed by consolidation of railway companies and the power company in 1913, it ceased to be a mere railway company. Before its change of name in 1922 and the 1923 consolidation, it had become primarily a power company. There was nothing concealed or surreptitious in the expansion of the light and power business, generally or at Middletown, or in the origin of the power company or the construction or use of the plant at Security or the high tension transmission lines. The facts must have been, and evidently were, shown to the Public Service Commission. Evidently they were of such common knowledge that six months before electric lights for streets and private buildings were introduced into Middletown the matter was an item of special interest in the local newspaper; on October 27, 1911 the plaintiff husband was reported to have participated in a town meeting and advocated procurement of electric lights for the town. He has been a domestic user of electricity at Middletown since 1919; his father was such a user from 1920 till his death. Before the power company was formed, and eighteen months before it began service from Security over its transmission lines, the project was discussed in the Middletown newspaper and from time to time later the progress of events was reported. Of course, plaintiffs are not charged with knowledge of the contents of the Middletown newspaper. The newspaper is mentioned, not as evidence of disputed or disputable facts, but merely as illustrating that, originally and in advance, even in that small community, the existence and expansion of the power business was not hidden or obscured.

On the facts, the use of the right of way in question for high tension transmission lines was not within the grant by deed or merely incidental thereto, but was an open, uninterrupted, adverse use for much more than twenty years before this suit was instituted. Defendant by such use acquired a prescriptive easement to continue the use.

*Order reversed, with costs, and bill dismissed.*

## ON MOTION FOR REARGUMENT

In a motion for reargument plaintiffs dispute statements in the opinion regarding the railway business at or about the time of the 1913 consolidation and ask that the case be remanded with leave to them to offer additional evidence to disprove such statements. They proffer meaningless fragments of testimony at a hearing in 1913 and comparisons of statistics that are not comparable *e. g.*, for 1910 (six months) with 1911 (twelve months) and for 1912 (Frederick company) with 1913 (Frederick and Hagerstown companies.) It is not necessary to pursue these contentions. The statements in the opinion, so far as plaintiffs attempt to disprove them, are immaterial, because they are not necessary to the decision. The record and the additional evidence proffered by plaintiffs show that the power business, even before 1913, was an existing and expanding busines, not a temporary or incidental user of "excess" power. Moreover, 1913 is not a decisive date. Suit was instituted more than thirty-four years after the 1913 consolidation, thirty-two years after the Middletown grant of an electric light street franchise, twenty-five years after the change of name of Hagerstown and Frederick Railway Company, and almost twenty-four years after the 1923 consolidation. The opinion has been modified and some immaterial statements have been omitted or qualified.

*Motion for reargument denied.*