876 A.2d 58

**SOUTH EASTON NEIGHBORHOOD
ASSOCIATION, INC., et al.**

v.

**TOWN OF EASTON, MARYLAND, et al.**

**No. 120, Sept. Term, 2004.**

Court of Appeals of Maryland.

June 3, 2005.

Reconsideration Denied July 14, 2005.

470

Michael J. Jacobs (Melanie J. Barney of Jacobs & Barney, on brief), Easton, MD, for appellants.

Christopher B. Kehoe (Alexis E. Kramer of Ewing, Dietz, Fountain & Kehoe, P.A. on brief), Richard A. DeTar (Demetrios G. Kaouris of Miles & Stockbridge, P.C., on brief), Easton, MD, for appellees.

Argued before BELL, C.J., and RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

HARRELL, J.

This case began with a request by Shore Health Systems, Incorporated ("SHS"), operator of the Easton Memorial Hospital in Easton, Maryland (the "Hospital"), to expand the Hospital's emergency room facilities. A prerequisite for construction of the planned expansion was the closure and conveyance to SHS of the roadbed of Adkins Avenue, a public street of the Town of Easton ("Town"), an incorporated municipality. The closure and conveyance would allow the new facility to be built across the existing public right-of-way.

A hearing was held by the Town Council to consider concurrently the proposed closure of Adkins Avenue and a zoning amendment for the proposed Hospital expansion. SHS claimed that the existing Hospital was designed for less than one-half of the current patient flow. Construction over the street bed was asserted as the only viable expansion alternative for the increased need for emergency room services. The South Easton Neighborhood Association, Inc. ("SENA") opposed the closing of Adkins Avenue, offering two main arguments: (a) it would leave local neighborhood residents without a safe alternative to access downtown Easton; and (b) the existing use of Adkins Avenue by the public foreclosed the Town's ability to close the street and convey the street bed to SHS. On 5 January 2004, the Town Council enacted Ordinance No. 466, closing Adkins Avenue and authorizing the conveyance to SHS of the lion's share of the street bed.

SENA filed in the Circuit Court for Talbot County a two count petition against the Town, generally seeking to enjoin the closure and transfer. The first count sought a declaration, pursuant to the Declaratory Judgment Act, §§ 3–401, et. seq. of the Courts and Judicial Proceedings Article of the Maryland Code, that Ordinance No. 466 exceeded the statutory authority granted to the Town Council under Article 23A, § 2(b)(24) of the Maryland Code. The second count sought judicial review of the Town Council's action as if it were reviewable as the final action of an administrative agency or body.

At a motions hearing on 30 July 2004, the Circuit Court orally granted summary judgment to the Town and SHS (the latter having intervened as a party defendant), indicating its intention to declare Ordinance No. 466 to be a valid exercise of the authority granted to the Town by Article 23A, § 2(b)(24). In the judgment entered on 3 August 2004, the Circuit Court declared Ordinance No. 466 lawful and, with respect to SENA's petition for judicial review, affirmed the Town Council's decision to close and convey Adkins Avenue. SENA's post-judgment motions were denied.

SENA appealed to the Court of Special Appeals. We granted a writ of certiorari, on the petition of SHS and the Town (collectively described here as Appellees)[1] before the intermediate appellate court could consider the appeal (see § 12–201 of the Courts and Judicial Proceedings Article, Md. Code (1973, 2002 Repl.Vol.) and Maryland Rule 8–302) to decide the following questions, which we re-order to facilitate our analysis:

I. Whether the Town, in authorizing the closing and conveyance to private parties of an actively used public road, violated its fiduciary responsibilities under Maryland law with respect to that public road and failed to meet its burden of proof as a fiduciary for the challenged closing of an actively-used public street.[2]

II. Whether the requirement in Section 2(b)(24) of Article 23A that municipal property may be conveyed when the legislative body determines that "it is no longer needed for

1. SHS and the Town filed their joint petition for writ of certiorari to bypass the Court of Special Appeals even though they succeeded in the Circuit Court. The reason given for their initiative was the substantial public interest in constructing promptly the new emergency room facility. SENA, which filed a cross-petition, also desired that we assume jurisdiction over the appeal.

2. In our Order, dated 17 December 2004, acting on the pending petitions for certiorari, we denied SENA's cross-petition without prejudice to raise any issues it may have raised properly before the Court of Special Appeals. The first question posed here was raised by SENA in its brief.

any public use" prohibits a municipality from conveying public property to a private person or entity if a limited minority of public uses the public property for convenience.

III. Whether the Town properly determined that closing Adkins Avenue to enable SHS to construct a new emergency care facility promotes a public benefit.

IV. Whether SENA submitted sufficient evidence of judicial bias to require Judge Horne to recuse himself from deciding this case.

For reasons to be explained, we shall affirm the judgment of the Circuit Court.

## I.

Further judicial review of the Circuit Court's order upholding the Town Council's decision to close Adkins Avenue cannot be maintained as an action for judicial review of an administrative agency's decision. Our review here shall be directed to the Circuit Court's declaratory judgment, an appealable final order.[3]

---

**3.** We raise on our initiative the question of the jurisdiction in the appellate courts and the Circuit Court to consider the petition for judicial review aspect of this case. SENA appeals the declaratory relief granted and further seeks judicial review of the affirmance of the Town Council's decision to pass Ordinance No. 466. We clearly have jurisdiction over the appeal as to the declaration, a final judgment. Md. Code (1973, 2002 Repl.Vol.) § 12–301 of the Cts. and Judicial Proceedings Article.

In its petition (Count 2) in the Circuit Court, SENA pled for judicial review, pursuant to Maryland Rule 7–202, "as to the lawfulness" of the enactment of Amended Ordinance No. 466. It also sought injunctive and other relief without specifying as to whether that relief was sought as consideration of the declaratory action or judicial review. SENA made no attempt to identify the source of its implied legal right to judicial review of the Town Council's action in the Circuit Court. Although Chapter 200 of Title 7 of the Maryland Rules provides the process for how judicial review of administrative agency decisions is to proceed, it does not grant the right to a party to seek review of an administrative decision. *County Council for Prince George's County v. Carl M. Freeman Assocs., Inc.*, 281 Md. 70, 74, 376 A.2d 860, 862 (1977) (the "B" Rules (the predecessors to Chapter 200 of Title 7 of the Maryland Rules) do not create a statutory right of appeal).

There appears to be no statutory authority for the Circuit Court to consider a petition for judicial review of the Town Council's decision to close Adkins Avenue. If there were an authorizing provision, it likely would be deemed a special remedy allowed by statute or ordinance and thus preclude the declaratory relief sought by SENA. § 3–409(b) of the Cts. and Judicial Proceedings Article; *see Converge Servs. Group, LLC v. Curran,* 383 Md. 462, 478, 860 A.2d 871, 880 (2004); *Utilities, Inc. v. Wash. Suburban Sanitary Comm'n,* 362 Md. 37, 45, 763 A.2d 129, 133 (2000) (holding § 3–409(b) of the Declaratory Judgment Act applies to special statutory remedies beginning with either administrative or judicial proceedings); *Maryland–National Capital Park and Planning Comm'n v. Washington Nat'l Arena,* 282 Md., 588, 596, 386 A.2d 1216, 1223 (1978) (observing that § 3–409(b) of the Declaratory Judgments Act would deprive a trial court of the "power to render a declaratory decree only in those cases where the Legislature intended to prohibit the exercise of concurrent jurisdiction by the courts"). Our research did not uncover a legislative authorization for judicial review of the Town's actions in the Circuit Court in either the Maryland Code or the Town of Easton Charter or Ordinances.

Even absent such statutory authority, we have authorized, in limited, Constitutional circumstances, the judiciary to exercise its inherent authority to review quasi-judicial decisions by administrative agencies. *Bd. of Educ. v. Sec'y of Pers.,* 317 Md. 34, 44, 562 A.2d 700, 705 (1989); *Dep't of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 223, 334 A.2d 514, 523 (1975). The courts retain "inherent power to review actions of administrative boards shown to be arbitrary, illegal or capricious, and to impair personal or property rights . . .," *Heaps v. Cobb,* 185 Md. 372, 379, 45 A.2d 73, 76 (1945), when an administrative agency acts in a quasi-judicial capacity.

In contrast, "the courts are likewise without authority to interfere with any exercise of the legislative prerogative within constitutional limits, or with the lawful exercise of administrative authority or discretion." *Id.* Maryland courts, however, may entertain cases when the sole issue raised may be characterized fairly as seeking a common law writ of mandamus as relief. *Bucktail, LLC v. County Council,* 352 Md. 530, 541–42, 723 A.2d 440, 445 (1999) (allowing appeal of Circuit Court's judicial review of county council's decision to deny a zoning amendment ordinance as substantially seeking a common law writ of mandamus where Bucktail's application for a zoning amendment met all mandatory submittal requirements and was recommended for approval by the Talbot County Planning Commission). Any vestige of discretion exercised by the administrative agency, however, will prevent the characterization of such an appeal as one seeking a writ of mandamus. *See Criminal Injuries Comp. Bd. v. Gould,* 273 Md. 486, 504, 331 A.2d 55, 66 (1975). A common law writ of mandamus is one where the relief sought involves the traditional enforcement of a ministerial act (a legal duty) by recalcitrant public officials. *Gisriel v. Ocean City Bd. of Supervisors of Elections,* 345 Md. 477, 497–500, 693 A.2d 757, 767–68 (1997) (petition for judicial review was characterized properly as one seeking a common law writ of mandamus where the plaintiff sought to compel the Board of Elections to perform its duty in executing the terms of the Ocean City Charter regarding qualified and registered

## II.

The Hospital lies within a Commercial–Medical Zoning District ("C–M Zone")[4], established in 1993 and last amended by Town ordinance in 1998. The Hospital's main campus bears the address 219 South Washington Street. The campus is bordered on the north and south by Biery Street and West Earle Avenue, respectively, and on the west by Adkins Avenue. Adkins Avenue is approximately nine hundred feet long and runs in a north/south direction, connecting Biery Street to Earle Avenue. Adkins Avenue is forty feet wide at its northern terminus with Biery Street and fifty feet wide at its southern terminus with Earle Avenue.

voters); *Murrell v. Mayor of Balt.*, 376 Md. 170, 196, 829 A.2d 548, 564 (2003) (where the original complaint was in substance more like a common law mandamus action than a petition for judicial review); *but see id.* at 199–200, 829 A.2d at 565–66 (observing that original petition for judicial review was not considered by petitioner as a writ of mandamus until appealed) (Wilner, J., dissenting).

We are unable to characterize the petition for judicial review aspect of the present action as one seeking review of an administrative agency acting in its quasi-judicial capacity or in pursuit of a common law writ of mandamus. In its challenge to the Town Council's decision to enact Ordinance No. 466, SENA seeks, at a minimum, review of the legislative action of the Town Council to close a street bed under both a town charter provision and a Maryland statute granting the Town the discretion to enact an ordinance accomplishing that act. Thus, the petition for judicial review in this case may not be characterized fairly as a common law action of mandamus.

Even if the Circuit Court possessed jurisdiction to exercise appellate review of the Town Council's decision in this regard, our appellate jurisdiction is lacking over the judgment of the Circuit Court's affirmance of the Town Council's decision. There is no legislatively-granted right to appeal or seek judicial review, in the Town Charter or Ordinances, authorizing further judicial review of the Circuit Court's judgment entered in the exercise of its appellate jurisdiction. Md.Code (1973, 2002 Repl.Vol.), § 12–302(a) of the Cts. and Judicial Proceedings Article. Because this case may not be characterized as a common law writ of mandamus action, there is no appellate jurisdiction for review by this Court akin to *Bucktail, Gisriel,* and *Murrell, supra.*

4. The C–M Zone is a floating zone (much like a planned-unit development, or PUD) providing for the planned and orderly development of medical facilities in Easton. See *Mayor of Rockville v. Rylyns Enters., Inc.*, 372 Md. 514, 533–35 n. 9, 539 n. 15, 814 A.2d 469, 480–81 n. 9, 484 n. 15 (2002), for a comparison of floating versus Euclidean zoning.

The Hospital is wholly-owned by SHS, a Maryland non-profit, non-stock charitable corporation providing emergency, diagnostic, and clinical medical care on the Eastern Shore of Maryland, principally through two hospitals—the Hospital and Dorchester General Hospital in Cambridge, Maryland, as well as other facilities. Other than the two hospitals operated by SHS, there are no other hospitals in Talbot, Dorchester, Queen Anne's or Caroline Counties.

The Hospital Emergency Room (the "Emergency Room") was designed in 1983 to accommodate approximately 13,000 visits annually. At the time of the Town Council meeting in October 2003, the Emergency Room was receiving approximately 41,000 visits per year. Estimates supplied by SHS indicated that approximately 50,000 patients would present at the Emergency Room by the year 2015, based on population growth and demographic progression.

On 20 October 2003 the Town Council held a joint public hearing to consider, among other things, the proposed amendment to the C–M Zone to accommodate the Hospital expansion. In its request, SHS represented to the Town that a prerequisite to the construction of the expanded Emergency room was the closure and conveyance of Adkins Avenue to SHS. SHS proposed expanding the Hospital facility across the street bed and onto lots SHS controlled on the opposite side of Adkins Avenue. Title to the street bed was to be transferred to SHS. The record contains a letter from the Chairman of the Town's Planning and Zoning Commission and a Town staff report, both of which recommended approval of the closure of Adkins Avenue and propose no other or a future public use or purpose for the street bed. SHS submitted a traffic study showing that only 5–6 cars per hour drove the length of Adkins Avenue during peak travel periods. (Figure 1 depicts a not-to-scale drawing of the proposed Emergency Room expansion across the bed of Adkins Avenue).

Figure 1

SENA purported to be acting at the Town Council hearing on behalf of area residents in its opposition to SHS's requests.[5] Wye Avenue, which runs parallel to Adkins Avenue, was alleged to be an impractical alternative for public ingress and egress because of street congestion, pedestrian use, and a lack of off-street parking. After submitting petitions supporting that Adkins Avenue be retained as a much-desired public right of way by the local residents, SENA argued that the Town lacked the legal authority to close Adkins Avenue because the on-going public use of Adkins Avenue, to any degree, foreclosed the Town's discretion to close the street under Article 23A, § 2(b)(24) of the Maryland Code.[6]

---

**5.** The residents supporting SENA at the Town Council hearing, and as named parties in this case, are either residents or property owners on the several streets surrounding the Hospital. None of these properties abut Adkins Avenue. The Hospital and a synagogue are the sole owners of the property abutting Adkins Avenue.

**6.** Article 23A, § 2(b) states:

On 3 November 2004, the Town Council approved the closure of Adkins Avenue. On 5 January 2004, the Town Council enacted Amended Ordinance No. 466 and conveyed the relevant portion of the street bed to SHS. The Amended Ordinance authorized:

(1) closing Adkins Avenue and conveying a portion of the bed of that street to SHS as requested by it will serve a public purpose and benefit, namely, facilitating the provision of emergency and outpatient care services to the residents of the Town, Talbot County and surrounding counties; and (2) closing the remaining portion of the bed of Adkins Avenue to the Temple [7] is appropriate since no public

---

(b) *Express Powers.*—In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, such legislative body also shall have the following express ordinance-making powers:

\* \* \* \*

(24) To acquire by conveyance, purchase or condemnation real or leasehold property needed for any public purpose; to erect buildings thereon for the benefit of the municipality; and to sell at public or private sale after twenty days' public notice and to convey to the purchaser or purchasers thereof any real or leasehold property belonging to the municipality when such legislative body determines that the same is no longer needed for any public use.

To take by gift, grant, bequest, or devise and to hold real and personal property absolutely or in trust for parks or gardens, or for the erection of statutes, monuments, buildings, or structures, or for any public use, upon such terms and conditions as may be prescribed by the grantor or donor, and accepted by the municipality; to provide for the proper administration of the same; and to convey the same when such legislative body determines that it is no longer needed for public purposes, subject to the terms and conditions of the original grant.

Md.Code (1957, 2001 Repl.Vol.).

All Maryland Code citations contained herein, unless otherwise specified, will be to Article 23A, 2001 Replacement Volume, in effect at the time of the motions hearing in the Circuit Court. A portion of § 2(b), not relevant to this appeal, was amended, effective 1 October 2004. 2004 Md. Laws Chap. 282.

7. A small portion of the street bed was to be transferred to the Temple B'nai Israel Congregation (the "Temple"), which fronts on the northwest corner of the intersection of Adkins Avenue and Earle Avenue. The Temple is not a participant in this appeal.

purpose is served by maintaining that portion of Adkins Avenue as a public street.

The Ordinance also incorporated by exhibit a new boundary line revision plat ("McCrone Plat") submitted by SHS. The McCrone Plat showed that SHS and the Temple, the sole property owners abutting Adkins Avenue, would receive the streetbed, which was captioned on the McCrone Plat as "to be abandoned."

Ordinance No. 466 incorporated a statement of the Town Council's Findings of Fact. These findings included: 1) Adkins Avenue is used as a convenience by area residents in lieu of Wye Avenue; 2) SHS would maintain a means of access of transit between Earle Avenue and Biery Street in the event that an emergency would close access to Wye Avenue and South Washington Street; 3) Town Charter Article II § 17–A (3) [8] authorized the Town Council to close public streets; 4) closing a portion of Adkins Avenue was in the best interest of the public in providing improved emergency medical services to the Town; 5) the Hospital would use approximately 250 feet of the 900 foot street bed for the addition to the Hospital and the proposed Emergency Room; 6) there is no particular benefit in publicly maintaining the portion of Adkins Avenue remaining after the Hospital's construction of the expanded Emergency Room; and, 7) the Town Council was authorized to convey the remaining street bed pursuant to Md.Code Article 23A, § 2(b)(24). (Figure 2 depicts the Hospital in relation to the streets of the Town. Pennsfield Lane, depicted here parallel to Wye Avenue and Adkins Avenue, is an alley).

---

8. Town Charter Article II § 17–A (3) states that the Town may, "(3) Grade, straighten, widen, alter, improve, or close up any existing town public street or way or part thereof."

Figure 2

Amended Ordinance No. 465 also was enacted 5 January 2004. This ordinance amended the C–M District Zone to reflect the Emergency Room expansion and incorporated by reference the Emergency Services Pavilion and Outpatient Center C–M District Application & Amendment Sketch Plan detailing the construction of the Emergency Room over the to-be-closed street bed of Adkins Avenue. Ordinance No. 465 also incorporated the closure of Adkins Avenue, stating that the "Town Council will take the necessary legislative action" to close and transfer Adkins Avenue to SHS and the Temple.[9]

9. The Easton Planning and Zoning Commission convened twice to consider the proposed zoning amendment and street closure. After both meetings, the Chairman stated in a letter that the Commission "supported the vacation of Adkins Avenue". The Town Engineer also reviewed the proposed renovations to the Hospital and, while not specifically addressing the closing of Adkins Avenue, did not identify an

On 4 February 2004 SENA filed in the Circuit Court for Talbot County its two count complaint against the Town. SENA reiterated in its complaint that the Town lacked legal authority to close Adkins Avenue while the street still was being used by the public. It alleged that the Town held Adkins Avenue in trust for the public use. Lastly, it alleged, in its judicial review request, that the Town acted arbitrarily and capriciously in adopting Ordinance No. 466. Four months after filing the suit, SENA moved for assignment of a judge to hear the case who was not dependant on SHS for health care, claiming that the sole sitting judge in the Circuit Court should recuse himself if he or any member of his immediate family relied upon SHS for necessary health care.

After SHS intervened as a party defendant, SHS and the Town moved separately for summary judgment on both counts. In both motions, the parties claimed that the Town was authorized under the Town Charter to close the street. They further asserted that the Town reached the necessary legal conclusion comporting with § 2(b)(24), that continued use of Adkins Avenue as a public thoroughfare was no longer needed and the construction of an expanded emergency room was a public use and public benefit. In addition, the Town opposed the motion for recusal of the judge, pointing out that the reasoning of SENA's motion effectively would extend to each sitting judge in each Circuit Court in the Mid–Shore Area.

The Honorable William S. Horne held a hearing in the Circuit Court on 30 July 2004 to consider the motion for his recusal and the motions for summary judgment. Regarding the recusal motion, counsel for SENA alleged that Judge Horne and his wife relied extensively on the Hospital for medical treatment. Because of this reliance, counsel believed that Judge Horne could not decide this litigation fairly and impartially. Judge Horne denied SENA's motion, stating that whether a judge depended on SHS for medical care for

---

alternate public use or purpose necessitating retention of the to-be-closed street bed.

himself/herself or his/her family was irrelevant to his or her ability to decide fairly the matters raised in SENA's complaint and the motions for summary judgment.

The Circuit Court granted summary judgment in favor of the Town and SHS and declared Ordinance No. 466 lawful. In its oral opinion, the Circuit Court stated that, even though the conveyance of the largest portion of the street bed of Adkins Avenue was to a private entity, the land transfer to build the expanded emergency room was for a public use and benefited the public. Although Adkins Avenue was being used as a public street to some extent, the Town Council properly determined, pursuant to § 2(b)(24), that it no longer was needed as a public street. The court also noted that the Town Council recognized that parallel, remaining streets could be used to arrive at the same locations that Adkins Avenue served. The Circuit Court concluded further that the planned public use of the street bed of Adkins Avenue for an expanded emergency room was superior to that of the convenience of the nearby residents in having Adkins Avenue continue as a public thoroughfare.

SENA filed a motion for a new trial, citing *Surratt v. Prince George's County,* 320 Md. 439, 578 A.2d 745 (1990). SENA's counsel alleged that Judge Horne had demonstrated a "rather remarkable and offensive pattern of judicial misconduct" towards the attorneys and clients of their firm and enclosed sealed affidavits allegedly supporting that position. Because of this alleged longstanding pattern of personal animus, counsel believed that their motion, as a matter of law, must be heard and ruled upon by another judge. Judge Horne denied the motion, without a hearing, on 2 September 2004.

### III.

SENA asserts that the Town, as the entity holding public roads in trust for the public as a matter of law, violated an implied fiduciary relationship to the general public. As support for the existence of this fiduciary relationship, SENA contends that we have held that " 'land held by a municipality

in its governmental capacity ... and therefore held in trust for the public cannot be disposed of without special statutory authority....'" *McRobie v. Mayor of Westernport*, 260 Md. 464, 467, 272 A.2d 655, 657 (1971) (quoting *City of Balt. v. Chesapeake Marine Ry. Co.*, 233 Md. 559, 572, 197 A.2d 821, 827 (1964)). SENA equates a municipal corporation's (and its officials') duty to hold property in trust for the public to that of the fiduciary duty a trustee would have towards a beneficiary. When a beneficiary or dependent party produces evidence that a trustee has violated its fiduciary duty, the trustee shoulders the burden of adducing proof to the contrary. *Lopez v. Lopez*, 250 Md. 491, 501, 243 A.2d 588, 594 (1968). As SENA sees it, the Town had the burden to rebut the alleged breach of its implied fiduciary duty to the public in its conveyance of Adkins Avenue to SHS. SENA's novel argument is incorrect.

As Appellees point out, the public trust discussed in *McRobie* has never been viewed as more than an advisory admonition to public officials.[10] In *Kerpelman v. Bd. of Pub. Works*, 261 Md. 436, 276 A.2d 56 (1971), Kerpelman's standing to sue was based on her status as a member of the Maryland public. She claimed that the public trust was violated by the Maryland Board of Public Works when it transferred wetlands in Worcester County to a private entity for a "completely and totally inadequate money consideration." *Id.* at 440, 276 A.2d at 58. She alleged that persons invested with legislative powers of government were trustees and accountable to her as a beneficiary of the public trust flowing from Article 6 of the

---

**10.** This is so unless an express fiduciary relationship is found to exist. See *Ward v. Mayor of Balt.*, 267 Md. 576, 298 A.2d 382 (1973) (holding that Baltimore City did not violate explicit trust agreement to invest proceeds from the sale of a testamentary transfer of real property for a public park when it later resold a portion of that public park if it invested the proceeds from that sale into improvements to the remaining park). SENA attempted before this Court, in a motion to correct the record, to introduce additional evidence not presented to the Town Council or the Circuit Court. This new evidence purportedly would indicate that Adkins Avenue was conveyed to the Town pursuant to a deed that contained conditions upon the conveyance. On 3 February 2005, we denied this motion.

Maryland Declaration of Rights.[11] We rejected the notion that Article 6 created a beneficiary-trustee relationship. We explained rather that the language of Article 6 was merely advisory. *Id.* at 444–45, 276 A.2d at 61.

An incorporated municipality, like Easton, invested with legislative powers under § 2(b)(24), holds property in trust for the public in a general sense, but not in a way creating a special relationship relative to the public at large. This " 'public trust' does not create a fiduciary relationship. 1 George T. Bogert, *The Law of Trusts and Trustees,* § 38, p. 422 (1984) (*'Public' office* is a 'trust' in the sense that confidence is imposed that the welfare of the public will be enhanced, but there is no trust [here].").

## IV.

 The exercise of the governmental power at issue in this case is solely that to convey a former public street bed. Our standard of review of the declaratory judgment entered as the result of the grant of a motion for summary judgment is whether that declaration was correct as a matter of law. *Converge Servs. Group, LLC v. Curran,* 383 Md. 462, 476, 860 A.2d 871, 879 (2004). For a declaration regarding a town council's decision to convey property used for government purposes (a legislative determination) to be correct as a matter of law, the analysis focuses on whether the decision was made within "the legal boundaries" of the Town's statutory authority. *See Dep't. of Natural Resources v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 224, 334 A.2d 514, 523 (1975).

## A.

 As an incorporated municipality, the Town is granted the express power to convey real property pursuant to Article 23A, § 2(b)(24) of the Maryland Code. After examining the

---

11. Article 6 stated in relevant part, that "all persons invested with the Legislative or Executive powers of Government are the Trustees of the Public, and, as such, accountable for their conduct. . . . "

.

statutory language of § 2(b)(24) and the issues presented by SENA, we agree with the Circuit Court and shall affirm the declaration regarding Amended Ordinance No. 466.[12]

Before deciding ultimately the legality of Amended Ordinance No. 466, it is necessary to explain two separate (origi-

---

**12.** Appellees did not raise in their petition for writ of certiorari whether SENA or its individual members, in order to maintain the complaint for declaratory judgment, possessed a special interest sufficiently greater than that of the general public. Although the Town raised the standing issue in its motion for summary judgment in the Circuit Court, the point was not addressed further at the motions hearing or in the final judgment. While we limit our review here to issues raised properly by our grant of the writ of certiorari, it is problematic whether SENA ultimately could triumph, as a matter of law, where none of its individual members own property abutting Adkins Avenue. We note that authority in this State does not support SENA's claim that it has suffered sufficient particular injury greater than the general public. *German Evangelical Lutheran St. Lucas Congregation v. Mayor of Balt.*, 123 Md. 142, 151–54, 90 A. 983 (1914) (explaining the widely held presumption that property owners that have portions of public right-of-ways closed that either merely leave inconvenient access to their property or the section closed does not abut their property suffer no greater than the public as a whole and are denied compensation for the closing); *Van Witson v. Gutman*, 79 Md. 405, 409–12, 29 A. 608, 609–10 (1894) (holding that statute permitted abutting landowners to have standing to challenge Baltimore City Ordinance closing one section of an alley for a private use); *see Riggs v. Winterode*, 100 Md. 439, 452, 59 A. 762, 767 (1905) (observing that property owners without a greater interest in a publicly used road have been precluded from seeking an injunction to halt the closure of a public street in other jurisdictions). Likewise, other states "almost universally" hold that when a street is closed in another block from the complaining property owner, the complaining property owner has not suffered sufficient special damages greater than that suffered by the general public. This is true even when it can be shown that the diversion of travel depreciates the value of property or the new route is less convenient. *See* 11 Eugene McQuillin, *Municipal Corporations*, § 30.194, p. 136–37 (3rd ed.2000). Without special damages or injury, or property abutting the soon-to-be-closed street, residents have been denied generally standing to sue for injunctive relief. *Id.* at § 30.200, p. 153; *but id.* at § 30.200, p. 153 (decisions granting residents that do not own property abutting on the soon-to-be closed street "should be regarded as unusual"); *see Inlet Assocs. v. Assateague House Condo. Assoc.*, 313 Md. 413, 440–43, 545 A.2d 1296, 1310–11 (1988) (holding Circuit Court's ruling not clearly erroneous that plaintiffs had standing for declaratory action seeking invalidation of *ultra vires* resolution conveying portion of public street and riparian rights to private entity for development where, among other things,

nally), but now intertwined, legal concepts at issue in this case. The first is the authority of a municipal corporation to convey governmental real property. At common law, municipalities had no inherent power to convey property used for governmental purposes, absent legislative approval from the General Assembly. *McRobie*, 260 Md. at 467–68, 272 A.2d at 657. Article 23A § 2(b)(24) supplies that legislative grant.

Article XI–E, § 3 of the Maryland Constitution granted Home Rule to municipal corporations, enabling those corporations to enact local laws or ordinances relating to their respective governmental affairs. Section 2(b) of Article 23A enumerates a non-exclusive list of "express ordinance-making" powers available to municipal corporations.[13] Ordinances passed pursuant to this broad-sweeping Home Rule power, however, are not permitted to be contrary to existing public general laws. Art. 23A, § 2(a); *Inlet Assocs. v. Assateague House Condo. Assoc.*, 313 Md. 413, 425, 545 A.2d 1296, 1302 (1988).

■ The second issue is the authority of a municipal corporation to close permanently a public street. Home Rule empowers municipal corporations with the authority to close streets. Md. Const. Art. XI–E, § 3; Art. 23A, § 1. The authority to close public streets is limited to circumstances where the closure, and subsequent transfer, of the public street does not benefit solely a private interest because the streets of a municipal corporation are held in trust for the benefit of the general public, "the closing of a street, and the conveyance of the [municipality's] interest in the street solely

---

plaintiffs held property near and adjoining the property for development).

**13.** Originally approved on 25 April 1947, Md. Laws Chap. 731, § 2(b)(24) remains unaltered from its original language despite two subsequent re-enactments. 1983 Md. Laws Chap. 398; 1995 Md. Laws Chap. 519. Section 2 of Article 23A was originally applied to Talbot County (and other counties). In 1973 an exemption which included Allegany, Anne Arundel, Baltimore, Calvert, Caroline, Cecil, Charles, Dorchester, Frederick, Kent, Prince George's, St. Mary's, Somerset, Washington, Wicomico, and Worcester Counties from § 2, was repealed. 1973 Md. Laws Chap. 451.

for the private benefit of another, is not within the legislative body's power...." *Inlet Assocs.*, 313 Md. at 431, 545 A.2d at 1305. Otherwise, the State possesses plenary power to close streets and may delegate that authority. *Mayor of Balt. v. Brengle*, 116 Md. 342, 81 A. 677 (1911) (holding that the closing of a public street in accordance with a legislatively sanctioned annexation plan to be valid); *see* 11 Eugene McQuillin, *Municipal Corporations*, § 30.185, p. 99–102 (3rd ed.2000).

We first addressed an appellate challenge to § 2(b)(24), some forty years after its enactment, in the factual context of the closure of a public street and the conveyance of the street bed. *Inlet Assocs. v. Assateague House Condominium Assoc.*, 313 Md. 413, 545 A.2d 1296 (1988).[14] Then–Chief Judge Murphy, writing for a unanimous Court, held that the express delegation of legislative authority by the General Assembly to municipal corporations required an "intention that the city council act upon municipal affairs through ordinances when performing its legislative function." *Id.* at 430, 545 A.2d at 1304. Before considering the substance of § 2(b)(24), we held that the controlling provisions of § 2(b) required the Town of Ocean City, a municipal corporation, to make an affirmative determination via an ordinance before conveying a portion of a public street to Inlet Associates. *Inlet Assocs.*, 313 Md. at 431, 545 A.2d at 1305. Because the municipal corporation conveyed the street bed via a resolution, rather than an

---

14. Our review of street closure decisions before 1988 were resolved on other grounds. The bulk of the cases were resolved before § 2(b)(24) was enacted or involved public entities to which § 2(b)(24) of Article 23A did not apply. *E.g., Perellis v. Mayor of Balt.*, 190 Md. 86, 57 A.2d 341 (1948); *Krebs v. Uhl*, 160 Md. 584, 154 A. 131 (1931); *Johnson v. Mayor of Oakland*, 148 Md. 432, 129 A. 648 (1925); *German Evangelical Lutheran St. Lucas Congregation v. Mayor of Balt.*, 123 Md. 142, 90 A. 983 (1914); *Mayor of Balt. v. Brengle*, 116 Md. 342, 81 A. 677 (1911); *Jenkins v. Riggs*, 100 Md. 427, 59 A. 758 (1905); *Van Witson v. Gutman*, 79 Md. 405, 29 A. 608 (1894). One case, *McKaig v. Mayor of Cumberland*, 208 Md. 95, 116 A.2d 384 (1955), was resolved subsequent to the enactment of Chapter 731 in 1947, concurrent with ratification of the Home Rule provisions of the Maryland Constitution, but before the repeal of the exemption to the provisions of § 2 of Article 23A granted in 1973 to municipal corporations within Allegany County.

ordinance, we held ineffective the Town of Ocean City's attempted conveyance of the street bed. We further expressed that the relevant controlling Ocean City Town Charter provisions, which did not require an express determination of whether the street bed was needed for any public use, were controlled by Article 23A, § 2(b)(24), namely that "a determination that there is no longer any public need for the street is requisite...." *Inlet Assocs.*, 313 Md. at 431, 545 A.2d at 1305.

### B.

 The gravamen of SENA's appeal is that Amended Ordinance No. 466 exceeded the statutory authority granted by § 2(b)(24). The contest here is limited to the determination of *why* the property was conveyed, although the exact means of the conveyance also is contested by SENA. Section 2(b)(24) of Art. 23A contemplates conveyance by a municipality of public property in two scenarios. The first occurs when the property was acquired initially by the municipal corporation through "conveyance, purchase or condemnation." The second is when a municipal corporation receives property by "gift, grant, bequest, or devise" and later conveys all or a portion of property so acquired.

The manner in which the municipality acquired the subject property in the first instance is unclear on this record.[15] This creates a hurdle to a determination under which scenario of § 2(b)(24) the operative facts should be analyzed. Of course, this omission may not be important if the tests that must be met under either scenario are functionally identical or, if different, the result would be the same on the particular facts of the present case. In the first scenario, the municipality may convey the property when the "legislative body determines that [it] is *no longer needed for any public use.*" Art. 23A, § 2(b)(24) (emphasis added). In the second, the municipality

---

15. There was no evidence presented to the Town Council or Circuit Court by SENA purporting to describe the means by which the Town acquired Adkins Avenue. *But see* notes 10 and 17, *supra,* considering SENA's denied motion to admit additional evidence.

may convey the property when it determines "it is *no longer needed for public purposes.* ..." *Id.* (emphasis added). In this case, Ordinance No. 466 conveyed the street bed to SHS, for the purpose of the expanded Emergency Room, and to the Temple, neither of which depended on Adkins Avenue for its sole main access.

Although there may be a conceptual difference between *public use* and *public purposes* as contemplated by the statute, property held for certain government purposes also may be a public use and a public purpose at the same time. Adkins Avenue, for example, is both. In *Inlet Associates,* we explained conclusively that the streets of a municipality are held in trust for the *benefit, use,* and convenience of the *general public.* 313 Md. at 431, 545 A.2d at 1305 (emphasis added) (citing *Sinclair v. Weber,* 204 Md. 324, 104 A.2d 561 (1954); *Townsend, Grace & Co. v. Epstein,* 93 Md. 537, 49 A. 629 (1901)).

Our holding in *Inlet Associates* notwithstanding, were we to parse the analytical paradigm into separate parts, the result would be the same. Public use is a somewhat undefined legal tenet—there is "[n]o satisfactory single clear-cut rule . . . which can decide all cases. . . ." *Green v. High Ridge Assoc.,* 346 Md. 65, 73, 695 A.2d 125, 128 (1997) (citation omitted). Ultimately, it is for the Judiciary to determine whether a particular use is public, although a reviewing court will "give weight" to legislative bodies in their own determinations of what constitutes a public use. *Id.,* 695 A.2d at 128–29; *Prince George's County v. Beard,* 266 Md. 83, 95–96, 291 A.2d 636, 642 (1972) (explaining that a legislative body cannot merely declare a public use without a judicial determination). For example, actual public use or an entitlement by the public to use the property is often sufficient to prove that a public use exists in condemnation cases. *Green,* 346 Md. at 74, 695 A.2d at 129. By comparison, a public purpose is a more broadly-defined term; a public purpose is a government-directed action for the benefit of the public as a whole. *Black's Law Dictionary,* 1267 (8th ed.2004). Examples of valid public purposes range from legal benefits to domestic partners of

county employees, *Tyma v. Montgomery County*, 369 Md. 497, 513, 801 A.2d 148, 157 (2002), to ensuring the habitability of housing, *Benik v. Hatcher*, 358 Md. 507, 531, 750 A.2d 10, 23 (2000).

 Here, we examine the determination by the Town Council in regard to Adkins Avenue as it existed at the time Ordinance No. 466 was enacted. Adkins Avenue, as a public street, was both a public use and used for a public purpose. The Findings of Fact by the Town Council reflect sufficiently this premise. In its Findings of Fact, the Town Council determined that the public use of Adkins Avenue was as an access to the existing Hospital and as a convenient route for nearby residents traveling downtown. With the zoning amendment approved, including the proposed Emergency Room expansion across the street bed, there no longer could be public use of Adkins Avenue as either an access or a through-street.[16] Likewise, Adkins Avenue served a public purpose of providing access for the public to the Hospital's existing emergency medical facility. SENA offers little argument, or evidence, that the Town Council did not consider the public use or purpose of Adkins Avenue, nor that the Town Council did not determine that Adkins Avenue was no longer needed for the existing public use or purpose. Furthermore, SENA offers little to rebut the Town Council's decision that the retention of Adkins Avenue was not needed for any other public use.

 Instead, SENA contends that Amended Ordinance No. 466 violates the Town's statutory authority because Adkins Avenue was an actively used public street.[17] It believes that the authority to convey or sell public property under

---

**16.** We consider separately the issue of the eventual use of the street bed once it is conveyed to SHS. *See* V., *infra.* In respect to the issue of closing a street, the Town's determination as to need for future public use and public purpose under § 2(b)(24) must be made with the current public use and purpose in mind, not the proposed use.

**17.** SENA also proposes that the conveyance of Adkins Avenue is a common law abandonment, which would be permitted only if the road

§ 2(b)(24) may be exercised only after a finding of non-use. In other words, *any* contemporaneous or actual public use would preclude the Town from conveying the street bed.

SENA relies on *Cristofani v. Board of Education of Prince George's County,* 98 Md.App. 90, 632 A.2d 447 (1993), to support its interpretation of Article 23A, § 2(b)(24) requiring *that any need* associated with contemporaneous use would foreclose the˙ Town from conveying the street bed. In that case, Judge Cathell, writing then for the Court of Special Appeals, explained that an incorporated municipality could not abandon land held in fee simple to a neighboring property owner. He further explained, by means of an example, that mere non-use, which may constitute abandonment, was insufficient to transfer property held for a governmental purpose, without a legislative determination pursuant to Article 23A, § 2(b)(24). *Cristofani* did not require the absence of use or need, but merely illustrated that if non-use existed alone, it would be an insufficient justification to convey the property. *Id.* at 96–97, 632 A.2d at 450.

---

has not been used by the public or accepted for maintenance by the Town. *See Welker v. Strosnider,* 22 Md.App. 401, 323 A.2d 626 (1974). This theory relies on the language in the McCrone Plat describing the transfer of the street bed of Adkins Avenue as an "abandonment." The "abandonment language" in the McCrone Plat cannot be read to be superior to the express language of Ordinance No. 466, which states that Adkins Avenue is to be *closed* and the street bed *conveyed* to SHS.

SENA also alleges that the Town is restricted from conveying Adkins Avenue by the "terms and conditions" of the original grant, Art. 23A, § 2(b)(24), relying on the proposed additional evidence proffered in its rejected motion to correct the record. It also suggests that there is a genuine dispute of material fact as to whether the Town holds Adkins Avenue in fee simple or merely as a public right of way. There is no evidence before us regarding any terms or conditions regarding the Town's use of Adkins Avenue; thus, SENA's proposition that Adkins Avenue was intended *only* as a public street must, and does, fail. If the Town were to hold only a right-of-way, closing the road would revert title to the street bed to the abutting property owners, SHS and the Temple. Md.Code (1974, 2003 Repl.Vol.) § 2–114 of the Real Property Article. *See* Md.Code (1974, 2003 Repl.Vol.) § 2–114 of the Real Property Article; *Maryland–National Capital Park and Planning Comm'n v. McCaw,* 246 Md. 662, 675–76, 229 A.2d 584, 591 (1967) (citations omitted).

In relying on the dicta in *Cristofani,* SENA ignores two principles of statutory construction. First, SENA's interpretation replaces "needed" with the term "used" in the statute, rendering "needed" nugatory and precluding any statutory effect being given to the ordinary meaning of the word. *Bd. of Educ. v. Lendo,* 295 Md. 55, 63, 453 A.2d 1185, 1189 (1982). Second, to adopt SENA's interpretation of Article 23, § 2(b)(24) would produce absurd results. *Coerper v. Comptroller of Treasury,* 265 Md. 3, 6, 288 A.2d 187, 188 (1972). Recognizing an absolute no-use standard would permit one person to walk the length of Adkins Avenue, or any other public right of way, and thereby foreclose any conveyance of the roadbed, regardless of the Town Council's legislative determinations.

SENA also argues that Ordinance No. 466 fails to mimic the exact language of § 2(b)(24) and therefore a determination that Adkins Avenue is "no longer needed" may not be deduced from this record without the Town Council reciting the so-called "magic words." We have held that mere incantation of the "magic words" of a legal test, as an adherence to form over substance, may not cause the Genie to appear and is neither required nor desired if actual consideration of the necessary legal considerations are apparent in the record. *Cannon v. Cannon,* 384 Md. 537, 559, 865 A.2d 563, 576 (2005); *Faulk v. Ewing,* 371 Md. 284, 305, 808 A.2d 1262, 1276 (2002). Here, the Town Council decided to close Adkins Avenue and transfer the street bed to SHS and the Temple only after its Planning & Zoning Commission, Town Engineer, Town Planner, and a staff report approved the closure without so much as a suggestion for any other future public use. If the closed street bed was needed for any other public use or purpose, the various town agencies and officials who pondered the fully revealed plans surely would have stated so. Although the Town Council did state that the portion of the street bed unconsumed by the Emergency Room expansion was no longer needed, there is sufficient substance in this record to support the Circuit Court's declaration that Ordinance No. 466

was legally correct and that the entire street bed was no longer needed.

In the alternative, SENA argues that the statutory language forbids a balancing test between competing public uses and benefits. Both the Town Council's Amended Ordinance No. 466 and the Circuit Court's oral opinion suggested, to some degree, assignment of a greater public purpose in closing Adkins Avenue and building an expanded Emergency Room than in maintaining Adkins Avenue "as is." Because Adkins Avenue is a street bed used by the public, SENA argues, any comparison to a subsequent public use is not a proper consideration when exercising the Town's authority to convey the public property.

Even if § 2(b)(24) disallowed expressly a balancing test, it allows a legislative body to convey property when that body determines the property is no longer needed. Town Charter Article II § 17–A (3) grants the Town Council the authority to close Adkins Avenue and, presuming for purposes of this case, the Town retains title to the street bed. Article 23A, § 2(b)(24) controls only the authority to convey that property. Once closed, Adkins Avenue was no longer needed for use as a public right of way and no longer needed for any public purpose.[18]

## V.

SENA argues that any transfer to SHS, a private entity, is for a private purpose, regardless of the eventual use

---

**18.** The general weight of other authorities indicate a less demanding judicial standard when reviewing the closure and the conveyance of a public street by a municipality. Many states will not question the closure of a public street in the absence of arbitrary action, fraud, or collusion. McQuillin, *supra,* at § 30.187 at 122–23 (citing twenty-one jurisdictions). Other authorities support the contention that the motive of the municipality to close is not reviewable. The proposed purpose of the closure is reviewable to determine whether this purpose is either *ultra vires* or for solely a private purpose. *Id.* at § 30.186 at 114–15, n. 1, 2 (citing sixteen jurisdictions, including *Perellis v. Mayor of Balt.,* 190 Md. 86, 57 A.2d 341 (1948)). Only two jurisdictions support the concept of a "no use" standard. *Id.* at § 30.186.10 at 121–22, n. 26, 27 (California and New Jersey).

to which the former street bed is put. SENA is correct that SHS is a private entity. *See Baltimore County Hosp., Inc. v. Maryland Hosp. Serv., Inc.,* 234 Md. 427, 429–30, 200 A.2d 39, 42 (1964) (citing *Levin v. Sinai Hosp.,* 186 Md. 174, 46 A.2d 298 (1946)). Adkins Avenue, SENA alleges, cannot be closed and conveyed to such a private entity.

■ Ultimately, the characterization of the transfer with which we should be concerned is determined by its use, and not by the private status of the property owner. *Perellis v. Mayor of Balt.,* 190 Md. 86, 92–95, 57 A.2d 341, 344–45 (1948). In *Perellis,* we considered the closing of a public street and held that it was "solely for the private advantage" of one private property owner. *Id.* at 95, 57 A.2d at 345. The eventual use of the closed street was to permit the private property owner to construct a building connecting two detached commercial properties. At the same time, other property owners abutting onto the public street would lose access to their properties by the closing of the public street. Ultimately, we stated that Maryland courts must determine "from the facts of each case presented whether the primary purpose or effect is public or private." *Id.* at 95, 57 A.2d at 346. Even though the property owner was to pay the cost of the changes to the street and offer the City use of an adjacent vacant lot for a new right of way, the eventual private use "vitiated the entire transaction." *Id.*

In contrast, in *Jenkins v. Riggs,* 100 Md. 427, 59 A. 758 (1905) and *Riggs v. Winterode,* 100 Md. 439, 59 A. 762 (1905),[19] we examined a street closure in which Baltimore County closed a publicly used road (pursuant to then § 12 of Article 25 of the Code of Public General Laws) that bisected Riggs Farm. In that case, the existing road had been in public use for "more than a century" as a connecting road and was in need of repair. *Jenkins,* 100 Md. at 429, 59 A. at 759. Somewhat like the condition of the record before the Court in

---

19. The *Riggs* cases involved two separate appeals regarding the same road closure. Both appeals were decided on the same day.

the present case, there was no evidence that Baltimore County had acquired title to the road bed. *Id.* According to an agreement with Baltimore County, Riggs graded two new roads on his property, both of which avoided the center of his farming operations, and conveyed title to these roads to Baltimore County, which, with public funds, paved with asphalt one of the roads. *Id.* at 433–34, 59 A. at 760. In upholding the closing of the existing public street, we upheld the County's decision to close the old road, to which it had questionable title, for the convenience of the public. *Winterode,* 100 Md. at 449, 59 A. at 766.

In a case where the party at issue was a hospital, we held that the authorization of the issuance of public bonds where some of the proceeds from that sale would be provided to a private hospital would be for a public purpose. *Finan v. Mayor of Cumberland,* 154 Md. 563, 141 A. 269 (1928). In that case, the Town of Cumberland issued bonds with 20% of the proceeds to be directed to an existing private entity, the Allegany Hospital of Sisters of Charity, for improvements and additions to the existing hospital. *Id.* at 564, 141 A. at 270. We ultimately concluded that the use of public funds by a private entity was acceptable when the eventual use of those funds, the erection and maintenance of a hospital for the benefit of the public, was a sufficiently public use. *Id.* at 565–67, 141 A. at 270–71.

The record before the Town Council and the Circuit Court in the present case provides ample illustration of the public purpose of the Hospital. The proposed expansion of the Emergency Room is also factually more similar to *Finan* and *Riggs* than *Perellis.* The necessity of the Emergency Room constitutes a public purpose that promotes clearly the public welfare.[20] Amended Ordinance No. 466 states that the new

---

**20.** Because the Hospital operates an emergency room, SHS stated (in a statement of grounds and authorities in support of its motion for summary judgment before the Circuit Court) that 42 U.S.C.S. § 1395dd (Lexis 2001) prevented it from "dumping" patients deemed unable to pay for medical care and required it to evaluate and stabilize all individuals that enter the Hospital with an emergency medical condi-

facility to be constructed across the street bed would serve an undeniably "public purpose and benefit, namely, facilitating the provision of emergency and outpatient care services to the residents of the Town.... " The Circuit Court's declaration is legally correct.

## VI.

As its last stand in this litigation, SENA alleges that Judge Horne abused his discretion in refusing to recuse himself.

In regard to such a pretrial motion, we have held that the party moving for recusal bears a "heavy burden to overcome the presumption of impartiality." *Attorney Grievance Comm'n v. Blum,* 373 Md. 275, 297, 818 A.2d 219, 232 (2003) (quoting *Attorney Grievance Comm'n v. Shaw,* 363 Md. 1, 11, 766 A.2d 1028, 1033 (2001)). Judges "occupy a distinguished and decisive position ... [requiring them] to maintain high standards of conduct." *Jefferson–El v. State,* 330 Md. 99, 106, 622 A.2d 737, 741 (1993) (citations omitted). Unless grounds for mandatory recusal are met, a judge's decision not to recuse himself or herself will be overturned only upon a showing of an abuse of discretion. *Surratt v. Prince George's County,* 320 Md. 439, 465, 578 A.2d 745, 757–58 (1990). An abuse of discretion standard is objective—"whether a reasonable member of the public knowing all the circumstances would be led to the conclusion that the judge's impartiality might reasonably be questioned." *In re Turney,* 311 Md. 246, 253, 533 A.2d 916, 920 (1987). Recognized grounds implicating possible partiality include a significant financial interest in a party or outcome, a pre-judicial relationship as an attorney with a party or counsel for a party, or a personal bias or prejudice concerning a party. Md. Rule 16–813, Canon 3C.

---

tion. *Hardy v. New York City Health and Hosps. Corp.,* 164 F.3d 789, 792 (C.A.2, 1999); *Bryan v. Rectors and Visitors of the Univ. of Virginia,* 95 F.3d 349, 351 (4th Cir.1996). This assertion (which SENA did not contest) also contributes to the public use and public benefit of the Emergency Room.

■ In this case, SENA did not allege any grounds consistent with the requirements for mandatory recusal.[21] The essence of the initial motion was that Judge Horne might be partial to SHS for fear that a ruling adverse to SHS's interests might result in the deprivation of adequate medical care to Judge Horne or his wife, who was seriously ill. SENA could not overcome the presumption of judicial impartiality, however, because it never mustered any evidence of an instance of partiality by Judge Horne toward SHS. Judge Horne recognized this and weighed sufficiently SENA's contention, stating:

> I share your opinion and if I had a scintilla of a concern that my decision in this case would be slanted in any direction by a fear of retaliation on the part of anyone or the hope or expectation of reward from anyone I would not hesitate to remove myself ... I feel that there is a presumption that judges are honorable people who understand the oath that they took to decide cases fairly and impartially.

■ SENA's second contention, that Judge Horne's conduct rose to the level of that in *Surratt*, blurs the line between personal and judicial conduct. In *Surratt*, we permitted counsel to move for recusal and have the motion heard by a different judge when personal misconduct between the sitting judge and counsel was alleged sufficiently. 320 Md. at 466, 578 A.2d at 758. The asserted basis for recusal was alleged long-standing sexual harassment by the male judge of the female counsel that was attested to by counsel on the record. While we made no conclusions about the accuracy of the allegations, we concluded that the alleged sexual harassment raised serious issues regarding the judge's personal conduct. *Id.* at 469, 578 A.2d at 760. We have defined personal conduct as "derived from an extra-judicial source ...," *Jefferson–El,*

---

21. Article IV, § 7 of the Maryland Constitution states:
No judge shall sit in any case wherein he may be interested, or where either of the parties may be connected with him, by affinity or consanguinity, within such degrees as now are not, or may hereafter be prescribed by Law, or where he shall have been of counsel in the case.

330 Md. at 107, 622 A.2d at 741, and held that the *Surratt* procedure is not available when "charges against the trial judge do not involve any personal misconduct." *Surratt,* 320 Md. at 467, 578 A.2d at 759 (citing *State v. Calhoun,* 306 Md. 692, 746, 511 A.2d 461, 488 (1986)).

On the record in the present case, Judge Horne asked SENA's counsel for specific examples of his impermissible judicial conduct. Each example listed by SENA's counsel involved examples of adverse rulings or decisions made by Judge Horne in a judicial setting. None rose nearly to the level of the alleged sexual harassment in *Surratt.*

*JUDGMENT OF THE CIRCUIT COURT FOR TALBOT COUNTY AFFIRMED. COSTS TO BE PAID BY APPEL-LANTS.*